(No. 35160.—

CENTRAL STANDARD LIFE INSURANCE COMPANY *et al.*, Appellees, *vs.* RAY P. GARDNER *et al.*, Appellants.

*Opinion filed September 24, 1959.*

ROBERT J. CLENDENIN, of Monmouth, GEORGE B. CHRISTENSEN, and EDWARD J. WENDROW, both of Chicago, (WINSTON, STRAWN, SMITH & PATTERSON, of Chicago, of counsel,) for appellants.

VERNON R. LOUCKS, and JAMES L. HENRY, both of Chicago, (CHARLES O. LOUCKS, and CLARKSON W. LOUCKS, of counsel,) for plaintiff-appellee, and EDWARD L. S. ARKEMA, of Chicago, for defendants-appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

The defendants, as holders of assessment policies designated as Class II in a certain reinsurance agreement hereafter referred to, were granted leave to appeal to this court from a decision of the Appellate Court, First District, which affirmed a decree of the superior court of Cook County approving an accounting by plaintiff as successor trustee of its acts in managing a trust of life insurance assets.

The original complaint filed by Central Standard Life Insurance Company (hereafter referred to as Central Standard) requested instructions as successor trustee under a specially created trust of life insurance assets being administered for the benefit of certain classes of persons insured under an assessment plan of insurance and further prayed an order approving the administration of the trust by Central Standard and its predecessor. Such approval was sought preparatory to raising rates of assessment.

Defendants filed objections to the accounting on the theory that both the original and successor trustee converted trust assets and trust income to their own use and through a series of self-dealings misconstrued the provisions of the trust in their own interest. Such objections have been consistently overruled and denied by the master in chancery, the circuit court, and the Appellate Court. There are no material questions of fact as to the actions of the original or successor trustees raised by the objections or the evidence. The questions presented for decision are whether or not the actions by the original and successor trustees constituted breaches of trust, or of contract.

Originally the defendants were insured by Illinois Bankers Life Association, (hereafter called the Association), a mutual assessment life insurance association. In 1929 a new stock company, Illinois Bankers Life Assurance Company, (hereafter called the Company), was organized to conduct an insurance business on the legal reserve basis.

A contract of reinsurance was entered into November 19, 1929, between the old Association and the new Company to permit the Company to reinsure the business of the Association. The 1929 reinsurance agreement provided that the Association assets be conveyed to the Company in trust, to be apportioned ratably between those members who elected to convert their then assessment policies into the new legal reserve insurance offered by the Company and those members who elected to remain on the assessment plan, which thereafter was to be administered by the Company. The assets from time to time apportioned by the Company for the benefit of those electing to convert to the Company's legal reserve insurance were withdrawn from the trust as policyholders converted and were "transferred" by the Company to itself, free of the trust, as a form of premium payment. Such "transferred" assets became its property.

The reinsurance agreement, after providing for the conveyance of all property of every kind of the Association to the Company and the latter's assumption of the risks, provided that the members shall thereafter pay premiums to it and that

"The members of the Association so reinsured shall contribute to the expenses of the Company, during the first two years after this contract goes into effect, 25% of the assessments and premiums as and when paid by such members. After the first two years the amount of such contribution shall be 22½% of said premiums and assessments. * * *

"Section 5. All the present funds of the Association shall be considered as Trust Funds for the benefit of the members of the Association, and, with accretions thereto and deductions therefrom, shall be invested from time to time in accordance with the provisions of the statute as to the investments of Legal Reserve Life Insurance Companies; and the Company shall, at all times, keep books of account of said funds.

"Accretions shall consist of (A) the assessments and premiums to be paid by continuing members, less contributions to expenses as set forth in Section 4; (B) interest accumulations at the rate of 4½% per annum on the reserves accumlated on the so-called Individual Reserve Policies, and at the rate of 4% per annum on the accumulated savings contributed by holders of Savings Accumulation policies, and at the rate of 3½% per annum on the remainder of such funds, but in no event at a rate greater than the actual net rate of interest earned on the funds, nor less than 3½%; and (C) the surplus earnings provided in Section 6.

"Deductions shall include (D) all policy payments and claims to the said members on the assessment plan and to their beneficiaries; and (E) any amounts apportioned and paid or credited to policies or certificates which may be converted as hereinafter set forth.

"There shall be set up by the Company from the aforesaid Trust Funds the legal reserve from time to time required to be set up to the credit of all policies or certificates assumed hereunder, and the special funds created in connection with policies on the Savings Plan and the reserves on the so-called Individual Reserve policies as provided by the terms of such policies.

"The Company shall have the power, as aforesaid, to invest said funds and to use the said funds, or the income therefrom, for the purpose of maintaining, as far as possible, the said present rates of the said certificates or for the benefit of the members of

the said Association. No dividends shall ever be paid by the said Company out of the funds of the Association or accretions thereto as herein provided.

"Section 6. In consideration of said transfer of insurance and of the contributions to expenses herein provided and any excess interest earnings or otherwise, said Company agrees that at the end of each calendar year it will pay into the Trust Fund set apart for the benefit of the members of said Association, that proportion of the surplus earnings of the Company accumulated during the year as set forth in the Annual Statement made in conformity with the requirements of the Department of Trade and Commerce of Illinois, exclusive of dividends paid or apportioned to participating legal reserve policy holders and interest earned on the capital and unassigned surplus, that the total assessment premium income of the year bears to the total renewal premium income of the Company, including the assessment premium income."

In 1951 Central Standard, by an agreement to reinsure all risks of the Company, became successor trustee and assumed all liabilities of the original trustee.

As more fully outlined in the case culminating in *Winger* v. *Chicago City Bank and Trust Co.* 394 Ill. 94, the creation and early administration of the Company was conceived in fraud by one Martin and his associates. However, that case involved ownership of stock in the Company, did not involve construction or management of the trust, and did not pass upon the acts of the Company in its capacity as trustee under the reinsurance agreement.

The selection of assets from the trust fund for transfer to the Company in its own right on account of converting policyholders took place while the Company was under the full control of Martin, as did the establishment of policies for administration and methods of computation and accounting of the trust fund, which methods have been followed consistently.

The process of apportionment of trust assets between converting and nonconverting policyholders pursuant to the reinsurance contract ran over a period of time. As of November 19, 1929, there was transferred from the trust fund to the Company assets valued at $2,233,021.85, including

$762,300 in real estate mortgages, $1,455,721.85 in bonds, and $15,000 in collateral loans. All of the real estate mortgages so transferred were on Illinois real estate except for $27,000 of Missouri mortgages. There was left in the trust fund at that time assets valued at $5,638,567.43, including $3,279,896.92 in real estate mortgages, $722,727.25 in real estate owned, $1,135,132.84 in bonds, $394,076.17 in cash, and the remainder in agents' balances and stocks. At a later date there was transferred from the trust fund to the Company additional assets valued at $1,072,944.15, including all of the trust fund cash, and additional Illinois real estate mortgages, bonds and collateral loans. There were thus left in the trust fund assets then valued at $4,565,622.98.

During the course of administration of the trust it became necessary to foreclose upon numerous of the mortgages therein. Foreclosure and related costs in the amount of $186,038.20 were paid by the trust fund and added to the book value of the real estate thus acquired on foreclosure. Class II defendants object that, since the trust agreement provides the Company shall pay all administration costs of the trust and be reimbursed for such expenses out of premiums according to a stated formula, such foreclosure costs should be refunded to the trust fund.

Among the assets conveyed to the Company as trustee was the Association's home office building in Monmouth, Illinois, carried on the books at a value of $84,305.47. The Company continued to occupy the building for its home office, and thereafter Central Standard, as successor trustee, occupied it as a branch office. They each furnished heat, janitor and watchman service, insurance, maintenance, etc., at their own expense and paid the taxes. Neither paid any cash rental as such into the trust fund, but did pay 3½% of book value of the building into the trust fund, under the Company's construction of the reinsurance contract that all income from the trust fund belonged to the Company and the Company merely paid 3½% of book value into the

trust fund each year. The trustee made no provision for depreciation or a depreciation reserve on the building. Defendants contend that the trustee wrongfully allocated to and retained in the trust fund in furtherance of their own interests the Monmouth building and wrongfully failed to preserve the depreciating trust asset by not setting up and maintaining a depreciation reserve.

In addition to the assets transferred to the Company pursuant to the reinsurance contract as reflected on the books, there was also transferred all the accounting equipment, furniture and fixtures, and certain prepaid fire insurance. None of these items were shown on the books as assets and were not included in the accounting; although they were admittedly received and used by the Company. The defendants argue that Central Standard must account for the value of this personal property and prepaid expense as part of the trust fund.

The most serious problem, in our judgment, arises from the handling of certain mineral interests in the trust fund. The trust originally included numerous mortgages on properties in Oklahoma, Kansas, Texas, Colorado and New Mexico. Many of these mortgages defaulted and the trust acquired title to the properties by foreclosure or agreement. Thereafter, when the farms were sold, all or a part of the mineral rights therein were reserved for the benefit of the trust. These reserved mineral rights were placed on the trust fund books at a value of $1 per tract, or a total of $5,408. On this value the trustees paid 3½% to the trust fund as the sole return thereon.

However, starting in the early 1930's and continuing through the accounting period, oil and gas leases were given on these mineral properties, extensive development occurred, and oil and gas bonuses and royalties in the total amount of $327,832.81, exclusive of delay rentals, were received by the trustee. Under the trustee's construction of the reinsurance contract, all of these oil and gas bonuses

and royalties were retained by the Company and Central Standard as their income, and the trust fund received no benefits therefrom of any nature. During the course of the trust the trustee did credit to the trust fund amounts received for pipe line and road rights of way, gravel sales, and fire and storm losses. On December 31, 1954, plaintiff completely sold out all of the trust's mineral reservations, both those that have been leased and those not under lease, for $531,000 and placed the net proceeds thereof in the trust fund.

Defendants contend as to these mineral rights, first, that the bonuses and royalties received were considerations for sale of removable freehold interests in the trust fund and should have been returned to trust fund as sales of trust corpus. Secondly, they contend that the mineral rights should have been carried on the books at more than nominal values of $1 per tract.

Pursuant to provisions of the reinsurance contract and in compliance with statutory requirements, the continuous practice of the Company and Central Standard, as its successor, has been to file its annual report each year with the Director of Insurance, including a statement of the amount due each year to the trust fund. Thereafter, every few years, the Director of Insurance, together with representatives of several other States, made extensive examinations of their records and accountings, recast the accountings with certain required changes, and required the Company and Central Standard to comply therewith. Plaintiff's basic defense and reply to all of defendants' objections to the accounting is that it has already been approved by all Directors of Insurance of Illinois, assisted by Directors of various other States, by a court-appointed actuary, by the master in chancery of the trial court, by the trial court itself, and by the Appellate Court. Therefore, it claims, its construction of the reinsurance contract and accounting thereunder should be approved.

However, it appears that there was no separate accounting of the trust fund distinguished from the general business of the Company and Central Standard rendered to the Department of Insurance, but such reports showed the balances in the trust fund. The insurance examiners verified that the securities, mortgages, *etc.,* claimed to be in the funds, were actually owned and were sufficient to meet the reserves required for outstanding policies. It does not appear that the examiners went into the legal construction of the reinsurance contract itself or that they considered the objections of the Class II defendants except in one instance. In that one instance it was noted that the trust should be construed as it relates to further distribution of proceeds from the sale of mineral interests and from royalties. Subject to the above comments, there is no question but that plaintiff operated its business and administered the trust with the approval of the Director of Insurance at all times.

Plaintiff further asserts that it sustained an "operating loss" in acting as trustee, on the basis of an exhibit prepared by its vice president, in the amount of $1,181,000. The issues raised in this case render it immaterial whether the trustee has made a profit or loss in its trust administration. The issues involve a construction of the trust agreement, whether there has been a breach of trust, and whether there has been a proper accounting. It should be observed in passing, however, that the report of the court-appointed actuary shows that by 1951 the capital and earned surplus of the Company was $2,189,233 after $1,032,500 of dividends had been paid to stockholders, although it started business in 1929 with only $150,000 of paid-in capital.

The foregoing is a substantially correct statement of pertinent facts as determined from the rather voluminous record in this case. We do not believe they are at variance with the master's factual findings in any material aspects. As heretofore noted, the questions presented are almost

entirely questions of construction or of law. We regard the findings of fact by the master and trial court as *prima facie* correct and concern ourselves solely with the questions of law and construction in determining whether the decree rendered was the proper one. *Hoelscher* v. *Hoelscher,* 322 Ill. 406.

Plaintiff's principal position is based on the fact that prior approval by the Department of Insurance of the trustee's regular accountings submitted to the Department pursuant to provisions of the reinsurance contract and statute, after compliance by the trustees with the Department's requirements, makes the constructions and accountings so adopted and approved free from review, revision or modification in this accounting procedure.

There is no dispute that the reinsurance contract specified that the annual statements setting forth the Company's liability to the trust fund should be after they had been brought into conformity with the requirements of the Department. Neither is there any dispute that the Insurance Department has broad powers to regulate and control the business of insurance companies. (Ill. Rev. Stat. 1957, chap. 73, Illinois Insurance Code.) Such contractual and statutory provisions, however, do not constitute a contract to oust the courts of jurisdiction or make the Director of Insurance an arbitrator over disputes concerning the contract and rights of the parties thereto.

If the defendants here had mutually construed the contract with plaintiff over a period of time by their actions and conduct, plaintiff's argument that a uniform, long continued construction of the contract should not be disturbed would carry weight, as was held in *McNely* v. *Board of Education,* 9 Ill.2d 143. However, to invoke such rule, the party against whom it is invoked must have been a party to such construction. The defendants herein, especially Class II policyholders, have never construed the reinsurance

contracts by acts or conduct on their part and are not thereby estopped to assert their claimed rights under the contract.

Likewise, the decisions of this court in *People ex rel. Parkinson* v. *Williams*, 392 Ill. 224, and *Winger* v. *Chicago City Bank and Trust Co.* 394 Ill. 94, clearly hold that policyholders have the right to enforce their contractual and trust rights directly in the courts, even over opposition of the Director of Insurance. A contract is here involved which created a trust. The plaintiff submitted itself to the jurisdiction of a court of chancery in bringing this suit as successor trustee. It is hornbook law that courts of chancery have original and inherent jurisdiction to recognize, execute and control trusts and trust funds. *Board of Education* v. *City of Rockford*, 372 Ill. 442.

In the *Williams case*, which involved an accounting action by a policyholder under a reinsurance contract opposed by a *mandamus* action by the Director of Insurance, this court held that the policyholder was entitled to maintain his action and have a court accounting. At page 238 of the opinion we said: "* * * section 201 does not assume to restrain the prosecution of actions based upon contractual rights. This section indicates that contract creditors are expected to pursue their contract rights in the courts. * * * Neither the general public nor the Director of the Department of Insurance has any interest in a construction or determination of primary contractual rights. Moreover, the functions of the Department of Insurance and the Director confirm this conclusion. The Insurance Code qualifies and commands the Director to supervise receivership, liquidation and rehabilitation proceedings and, further, to enforce the insurance laws by exercising his administrative powers and his administrative discretion. The determination and enforcement of contract rights are proper matters for disposition in the courts without intervention from the Director, or Department, of In-

surance." And at page 245 the court said: "* * * our Insurance Code does not purport to deprive policyholders of their rights and remedies against insurance companies, particularly where contractual rights are primarily involved. Generally speaking, it is only when 'a state of unsoundness' is reached that the rights and remedies of policyholders must yield to the superior authority of the Department of Insurance."

Again in the *Winger case,* beginning at page 102, we said on the same subject: "A fair interpretation of the statute now in effect indicates that accounting of insurance officials to policyholders, at the suit of the latter, is not prohibited by statute in express language, is not granted to the Director of Insurance, and cannot be held to be prohibited by law unless it interferes with the prosecution of the business of the insurance company. As an abstract proposition we cannot see how a suit by a policyholder to require a director to restore money to an insurance company, which he has diverted from its treasury, can interfere with the transaction of its business. The Insurance Code places upon the Director of Insurance certain specific duties enumerated in the different articles of the statute. It does not forbid an accounting at the suit of others, but only prohibits interference. Necessarily, with the vast number of insurance companies under the jurisdiction of the Director of Insurance it could not be reasonably said that he has been given exclusive power over every controversy between the individuals and the directors of the insurance company, but rather that he has certain specific powers and duties, where so stated in the several sections of the act, and also certain general powers, which do not go beyond the general supervision and direction of the administration of the business of insurance, and exclusive powers in case of liquidation or rehabilitation."

From the foregoing, we conclude that there is nothing in the reinsurance contract, the actions of the parties there-

under, or the actions of the various Directors of Insurance in approving the Company's accountings which prevents, prohibits or estops defendants from having their claimed contractual rights judicially reviewed and determined.

An examination of the entire reinsurance contract, paragraph by paragraph, discloses the following program to have been contemplated:

A. The Association transferred its insurance risks to the Company, with all pertinent insurance records and reports.

B. The Association transferred all of its assets, personal, real and mixed, to the Company.

C. The Company agreed to reinsure all of the Association's living members in good standing.

D. The reinsured members of the Association were to pay premiums to the Company, with a formula for prorating premiums to expenses of the Company.

E. All present funds of the Association were to be considered trust funds for the benefit of reinsured members with accretions and deductions, as heretofore set forth.

F. The Company was to pay a portion of its surplus earnings into the trust fund annually.

G. Each member of the Association was to have a right to convert to a legal reserve policy, with apportionment of the trust fund for those so converting.

H. The Company assumed and agreed to pay all claims of the Association out of funds transferred.

The evidence shows without dispute that the furniture and fixtures purchased by the Association had been treated by it as current expense on its books in keeping with generally accepted insurance accounting practice, were carried on its books at a zero value, and were not carried as an item of value in any fund on its books, at the time of execution of the reinsurance contract. The Director of Insurance used the same valuation and accounting standards. In our opinion, furniture and fixtures and prepaid insurance ex-

pense were not intended by the contracting parties to become part of any trust fund, but were intended to be used and consumed by the Company for the mutual benefit of all policyholders in the operation of the business from day to day, as was the accepted custom in the insurance industry at that time. We find no error in construction of the contract or breach of trust by the Company or by Central Standard in its failure to account for furniture, fixtures and prepaid insurance expense in its trust accounting.

The Monmouth office building, at the time of transfer from the Association to the Company, was carried on the books at a value of approximately $84,000. The building is still in the hands of the trustee and is subject to an order of court for its sale. Since the inception of the trust to date the Company has paid 3½% of its book value into the trust. The Company and Central Standard has occupied the building for insurance company purposes and has paid, as an item of expense from its own account and not from trust funds, all operating expenses, such as taxes, insurance, care and maintenance, heat and utilities, in addition to the 3½% payment into the trust fund. It is clear that the Company desired to and did use the building for its own corporate purposes, although the Company held title to the property as trustee. It is basic trust law that trustees do not have the right to deal with trust corpus for their individual benefit, and as part and parcel of such rule a trustee does not have the right to lease real estate of the trust to itself. (*Johnson* v. *Sarver,* 350 Ill. App. 565; *In re Will of Gleeson,* 5 Ill. App. 2d 61.) Wishing to use the building for its own purpose, the Company should have allocated the building to itself at the book value of $84,305.47 and left other assets allocated to itself in the trust fund. If the Company had done so, the trust would have continued with $84,305.47 of assets on which the Company would have been obligated to pay a minimum of 3½% per annum to the trust fund, which it has done, and to maintain and

operate the building at its own expense, which it has done. The only obligation of the trustee is to see that such value of $84,305.47 is maintained or restored to the trust fund. The office building has been appraised in 1954 at a "fair value" of $84,215, but there is serious question from the evidence that such figure actually represents market value. Only an actual *bona fide* sale can determine such actual value. Since a sale of such property has been heretofore ordered by the trial court, such order of sale should be carried out, without cost to the trust fund, and the plaintiff thereafter be required to reimburse the trust for any deficiency between the sale price and the original value.

Defendants further object to the Company having capitalized the cost of foreclosing mortgages held in the trust fund and adding the same to the value of assets held in the trust fund, contending that under the reinsurance contract all expenses of administration were to be paid for by the Company. The mortgages and trust deeds specifically provided that foreclosure expenses should be secured thereby and should constitute part of the principal to be foreclosed. It is specifically recognized in 1 Restatement of the Law of Trusts, 690, sec. 233-m, that the expenses of foreclosure of a mortgage held in trust are payable out of principal, and if the property is purchased on foreclosure by the trustee and it is nonincome producing, the carrying charges are payable out of principal until it is sold. Although the action of the Director of Insurance in auditing and reviewing the Company's reports is of no force in determining defendants' rights in the accounting, yet the Director's reports and other evidence indicate that the Company followed customary insurance company accounting practices in this respect. In our opinion, the contract of reinsurance contemplated and intended that customary practices should be followed by the Company in handling its costs of foreclosure and other costs, and the Company did not violate or breach its contractual or trust duties in capitalizing fore-

closure costs. The Company fully performed its contractual and trust duties in this respect by paying 3½% per annum on the increased book value of the trust assets into the trust fund.

The most difficult issue to resolve in this case is that raised by defendants' objection to the Company's handling of oil and gas royalties and bonuses. As heretofore noted, the Company retained as "income," under its construction of the reinsurance contract, all such royalties and bonuses. The defendants argue that oil and gas royalties are not "income" but consideration for sale of part of the trust corpus and therefore principal to be retained in the trust fund. In the second place, they argue that the reinsurance contract, properly construed, required the Company to pay into the trust fund all income received on the fund, with a guaranty by the Company of a minimum 3½% per annum return on the book value of trust assets.

Since this trust was created by contract executed in Illinois, has been and is being administered in Illinois, and most of the trust beneficiaries reside in Illinois, the trust situs is in Illinois. The situs of a trust is the place of performance of active duties of the trustee, (*Campbell* v. *Albers,* 313 Ill. App. 152,) and all questions concerning trust administration are to be determined by the law of the situs. (Beale, Conflict of Laws, sec. 297.2.) Thus Illinois law controls the solution of this question even though there is substantial diversity of opinion on the question of whether mineral royalties are income or principal. See annotation 18 A.L.R. 2d 98.

From the record it appears that none of the oil and gas properties in issue were productive or leased for oil and gas at the time the reinsurance contract was executed. Most properties were obtained by the trust fund through foreclosure of delinquent mortgages. When such properties were later sold or disposed of by the trustee mineral rights were reserved. The mineral rights remained trust assets.

The oil and gas leases later executed on such properties by the Company as trustee granted the right to the lessees therein to search for oil and gas and to reduce to possession such oil and gas as they might find, such rights in the lessees constituting a freehold estate. (*Fowley* v. *Braden*, 4 Ill.2d 355; *Deverick* v. *Bline*, 404 Ill. 302; *Ohio Oil Co.* v. *Wright*, 386 Ill. 206.) These leases did not work a severance of the oil and gas (*Updike* v. *Smith*, 378 Ill. 600), nor grant to the lessee any interest in the oil and gas in the ground, title to which remained in the Company as trustee until the oil and gas was found by the lessees and reduced to possession. (*Conover* v. *Parker*, 305 Ill. 292.) The consideration paid by the lessee for the right to remove this oil and gas is termed a "royalty." Oil and gas, like other minerals, is considered a wasting asset, a part of the real estate subject to depletion and exhaustion by removal, although such removal may continue over a period of years before exhaustion occurs. Once exhausted, its value is gone and not subject to further recovery. From the very nature of oil and gas royalties and bonuses, one cannot class them in the same category as the "rentals" or "income" realized annually from the normal, recurring production of crops from real estate or customary annual cash rentals paid for the surface use of real estate.

From the prior decisions of this court in *Ohio Oil Co.* v. *Daughetee*, 240 Ill. 361, and *Sewell* v. *Sewell*, 363 Ill. 166, which span the period of creation of the trust here in issue, it is the established rule in this State that royalties and bonuses, received as consideration for the permanent severance of natural resources such as oil and gas, are principal as distinguished from income and constitute part of the corpus of a trust to be reinvested to maintain the productivity of the estate. In the *Sewell case* we said, beginning at page 171: "In the *Ohio Oil Co. case, supra,* we held that for a life tenant to operate for oil would constitute waste which a court of equity would enjoin, and that a

tenant for life has no such right. * * * we must presume that when the probate court in Arkansas approved the lease of these oil lands on behalf of the infant appellees it did so for the benefit of the entire estate, and anticipating that the oil produced, as well as the preliminary bonus for the lease, would be considered a part of the land, the same above ground as it had been below. Similar situations have been so treated by many courts, and we believe this to be the just rule. * * * For the reasons which we have indicated we hold that all the funds which have arisen from the oil and gas lease in question shall be considered as a corpus, the fee of which is in the infant appellees [remaindermen] * * *." 363 Ill. 171-173.

This rule is now recognized by statute in section 10 of the Principal and Income Act adopted in 1941. (Ill. Rev. Stat. 1957, chap. 30, par. 168.) Although this statutory provision is not controlling in the decision of the issue now presented, by virtue of section 16 making such act prospective only in its operation, (Ill. Rev. Stat. 1955, chap. 30, par. 174,) yet it is in accord with the rules previously stated in the *Daughetee* and *Sewell cases,* and also with the Restatement of Trusts, § 239, comment g. Also recognizing this same conclusion is *Sternberg* v. *St. Louis Union Trust Co.* 66 F. Supp. 23, affirmed (8th cir.) 163 F.2d 714, cert. den. 332 U.S. 843, where royalties from an Illinois coal mine were involved in a Missouri testamentary trust.

As previously observed in this opinion, the action of the Director of Insurance in approving the manner in which the Company handled royalties and bonuses is not binding on the defendants, and whether the Company had a profit or loss under the reinsurance contract has no bearing on the extent of trust obligations assumed by the Company and plaintiff under the reinsurance contract. Neither is the fact that royalty or bonuses are treated as income for Federal income tax purposes, after certain allowances for depletion, controlling. Although the Federal income tax laws

require gain on the sale of real estate to be reported as income in a certain manner, no one would seriously contend that such gain is not part of the trust corpus. If income tax decisions were pertinent to the decision, *Campbell* v. *Great National Life Insurance Co.* (5th Cir.) 219 F.2d 693, has held that oil and gas bonuses and royalties received by life insurance companies are not considered income for income tax purposes.

This conclusion as to the nature of oil and gas royalties and bonuses is further confirmed by the plaintiff's concurrence in this very case with the legal conclusion that the proceeds of sale of remaining mineral interests and oil and gas leaseholds in the trust constitute part of the trust corpus. We can see no distinction in the nature of oil and gas royalties and bonuses as to being principal or income, depending on whether they have been realized in the past or will be realized in the future. One is a certainty and the other a speculative expectancy, but in either case they must be of the same nature and subject to the same rules.

We conclude that royalties and bonuses paid under oil and gas leases of the trust property were the considerations for sale of a portion of the real property belonging to the trust, represented a return of capital, and should have been credited to the trust.

However, the Company, in our opinion, was not in error in originally setting up such leaseholds on its books at a nominal value of $1 per tract. An oil and gas lease by its very nature is of the utmost speculative value until commercial production is obtained. No practical basis exists for reasonable valuation of an uncertain speculative return *in futuro*. Delay rentals paid were income and not principal, being an annual compensation to keep the lease in force. The Company followed a reasonable, practical and customary procedure in this instance. It was carrying its real estate at book value and paying 3½% per annum thereon. As bonuses and royalties were received, they

should have been added to the trust corpus and 3½% per annum thereon thereafter paid by the Company and plaintiff to the trust pursuant to the reinsurance contract.

We do not construe the reinsurance contract as requiring the Company and plaintiff to pay to the trust more than 3½% per annum on Class II trust funds if the actual net rate of interest earned on such funds exceeded 3½%. The second sentence of paragraph 5 of the contract, concerning accretions, as heretofore set forth, gives rise to the question of construction. Such sentence is divided into three clauses (A, B and C) and the latter part of clause B contains the language in issue. The entire clause, sentence, paragraph and contract must be read together. As we read and construe clause B referred to, it contemplated that the Company and plaintiff should pay interest accumulations into the trust fund at the rate of 4½% per annum on individual reserve policy reserves, at the rate of 4% per annum on savings accumulation policy savings, and at the rate of 3½% per annum on the remainder of trust funds. We find no intention in the contract to pay Class II funds of the trust more than 3½% per annum in any event, but a firm guarantee of such rate of return. This construction and interpretation is further impelled by the provision for allocation of surplus earnings of the Company in paragraph 6 of the contract.

The argument of plaintiff that defendants are estopped to make their objections to the account here asserted because they accepted and retained $15 a share as minority stockholders for their stock, based upon the statement of the Company as to its liabilities, is without foundation or merit. The contract of plaintiff assumed all liabilities of the Company, and not only those shown on the balance

sheet. Plaintiff received all of the assets of the Company, subject to the Company's trust obligations and duties. The Director of Insurance did not negotiate the sale of the Company for the policyholders, but merely approved as not injurious to the policyholders a reinsurance contract negotiated by the key officials of the Company and plaintiff. Plaintiff has not sought to rescind its purchase of the stock. Defendants received their stock as a result of the decision in the *Winger case* based on the fraudulent conception and organization of the Company. Plaintiff instituted this suit for approval of the acts of itself and the Company as trustee and successor trustee. Defendants are entitled to an accounting on the bases here set forth.

Accordingly, the judgment of the Appellate Court is affirmed in part and reversed in part, and the cause is remanded for further proceedings not inconsistent with the views herein set forth.

*Affirmed in part and reversed in part, and remanded.*