THE PEOPLE *ex rel.* NATHANIEL S. SHAPO, Director of Insurance, Plaintiff-Appellee, v. AGORA SYNDICATE, INC., Defendant-Appellant (INEX Insurance Exchange *et al.*, Intervenors).

First District (5th Division)   No. 1—00—4119

Opinion filed June 22, 2001.—Rehearing denied July 24, 2001.

Joseph D. Keenan III, of Chicago, for appellant.

Francis J. Higgins, of Bell, Boyd & Lloyd, L.L.C., and Dale A. Coonrod, both of Chicago, for appellee.

JUSTICE GREIMAN delivered the opinion of the court:

Agora Syndicate, Inc., the defendant, was an insurance syndicate member of the INEX Insurance Exchange, formerly known as the Illinois Insurance Exchange. Section 107.02 of the Illinois Insurance Code authorizes the incorporation of an exchange for the reinsurance and insurance of risks. 215 ILCS 5/107.02 (West 2000). In essence, the focal point of an insurance exchange is a trading area or floor that is:

"[O]ccupied by underwriters authorized by the exchange to bind risks on behalf of insurance or reinsurance entities commonly referred to as syndicates. These syndicates are capitalized in accordance with the requirements of the exchange's governing rules. Once approved to operate on the exchange, syndicates may accept risks for their own accounts and not jointly with other syndicates. In other words, although syndicates may participate on the same risk, the liability is several, not joint, and is limited to the percentage of participation agreed to by each underwriter accepting the risk." Bickford, *Regulation of Insurance Exchanges*, 21 Tort & Ins. L.J. 255, 256 (1986).

A unifying force among each of the insurance exchanges operating in the United States is the requirement of a security fund. "These funds are intended to provide additional protection to insureds of exchange syndicates in the event of their insolvency." Bickford, *Regulation of Insurance Exchanges*, 21 Tort & Ins. L.J. 255, 256-57 (1986). In Illinois, a syndicate's security fund is commonly referred to as the "Illinois Insurance Exchange Immediate Access Security Account" and differs from a guaranty fund in that "it contains a finite sum and has certain realistic limitations." This fund provides a syndicate with additional security, but is not to be treated as "a blank check." Bickford, *Regulation of Insurance Exchanges*, 21 Tort & Ins. L.J. 255, 266 (1986).

In August 2000, defendant reported having $1.58 million in capital and surplus as of June 30, 2000. Pursuant to the Illinois Insurance Code, defendant was required to have at least $1.5 million in capital and surplus. Also, in August of 2000, defendant devised a plan whereby it intended to settle all of its 170 outstanding claims with substantial savings against the reserves defendant was carrying for those 170 claims.

In September of 2000, KPMG Peat Marwick, LLP (KPMG), an accounting firm, issued an actuarial report for defendant as of June 30, 2001, which by its low-range projection, showed defendant had only $1.437 million in capital and surplus. KPMG's mid-range projection indicated a negative capital and surplus of -$5,954,110.

KPMG projected -$7,472,571 as defendant's mid-range reserve deficiency based on defendant's direct policy claim obligations (defendant's direct claims) and defendant's reinsurance obligation to Clarendon America Insurance Company under 100% quota share reinsurance agreement (Clarendon claims):

| | |
|---|---|
| a. Agora Direct Claims: | -$2,684,000 |
| b. Clarendon Claims: | -$4,789,000 |
| Total: | -$7,473,000. |

On September 8, 2000, defendant presented plaintiff with a plan (workout plan) under which it would eliminate its entire projected reserve deficiency and would provide payment of all its existing and future obligations as they came due from defendant's remaining assets. The workout plan was later revised to include the order of conservation that was entered by the trial court on September 14, 2000. The goal of the workout plan was to keep defendant from becoming insolvent and to wind down defendant's assets in an orderly fashion.

Under the terms of the workout plan, defendant had 90 days to prove the viability of the plan. Only if defendant could show that it had sufficient assets to pay all of its existing and future insurance obligations would plaintiff permit the release of the approximately $4.2 million that defendant held in two separate custodial accounts.

In late September 2000, the projected -$4,789,000 Clarendon claims deficiency was eliminated when Clarendon agreed to commute all of defendant's obligation to Clarendon under the 100% quota share reinsurance agreement. Thus, under the workout plan, all that remained was providing for the payment of all of defendant's present and future direct claims.

As of September 7, 2000, defendant's assets totaled $7.315 million. Under the workout plan, defendant planned to pay a total of $3.716 million in loss payments to close the remaining open direct claims. In an effort to close these claims, defendant also expected to pay $700,000 in loss adjustment expenses. As of October 15, 2000, defendant's unearned premium obligation was $248,000. Lastly, defendant intended to keep $960,000 in reserves for future claims, also known as incurred but not reported claims. Given these projected expenses, at the conclusion of the workout plan defendant's projected capital and surplus would be as follows:

| | |
|---|---|
| Defendant's Assets as of September 7, 2000: | $7,315,000 |
| Projected loss payments: | -$3,716,000 |
| Projected loss adjustment Expense payments: | -$ 700,000 |
| Projected future payments on Claims not yet reported: | -$ 960,000 |
| Unearned Premium (October 15, 2000): | -$ 248,000 |
| Director & Other Expenses: | - $? |
| Defendant's Projected Capital and Surplus: | +$1,691,000. |

The projected loss and reserve savings for projected loss adjustment expense payments for settling the open direct claims as of September 7, 2000, versus defendant's carried reserves as of June 30, 2000, totaled $1.932 million. The success of the workout plan hinged on defendant's success from August 17, 2000, to September 7, 2000, in settling 47 of its 170 open direct claims as of August 17, 2000, for a loss reserve savings of $442,000.

Included in defendant's assets of $7.315 million were approximately $4.263 million in assets, which defendant held in two custodial accounts. As of September 7, 2000, defendant had approximately $2.763 million on deposit in its "INEX Insurance Exchange Immediate Access Security Account" (IASA Account) and $1.5 million on deposit in its "INEX Insurance Exchange Guaranty Fund Account" (GF Account).

On September 14, 2000, the trial court entered an *ex parte* order of conservation, which enjoined defendant from making any further claims payments. On September 18, 2001, plaintiff ordered defendant to take no further action to implement the workout plan.

Plaintiff rejected defendant's workout plan and filed a complaint for liquidation on September 27, 2000. Defendant filed its answer and affirmative defenses on October 20, 2000. Plaintiff then filed a motion for judgment on the pleadings on October 30, 2000. On November 13, 2000, the trial court granted plaintiff's motion for judgment on the pleadings. The trial court's ruling was based on its determination that defendant's assets in its IASA Account and GF Account, totaling $4.2 million, could not be counted as available for the payment of defendant's current insurance obligations, and, therefore, defendant was insolvent. In other words, the trial court found that defendant's answer and affirmative defense did not show defendant to be solvent from a cash flow basis. According to the trial court, the allegations set forth by defendant in its answer and affirmative defense comported with plaintiff's allegation of defendant's insolvency, and, therefore, a material issue of fact did not exist, thereby mandating judgment on the pleadings. Defendant argues that its answer to the complaint cre-

ates an issue of fact. Plaintiff requested a finding of insolvency and liquidation in his complaint. More specifically, plaintiff asserted that defendant "currently has insufficient available liquid assets with which to pay such claim obligations as they fall due." In its answer to the complaint, defendant asserted that "it has insufficient liquid assets accessible to it at this time to pay its claim obligations"; however, defendant went on to state that it has various financial accounts which, if liquidated, contain sufficient money to cover its obligations. In its affirmative defense, defendant refuted the bleak outlook of defendant's financial status offered in the KPMG actuarial report. Specifically, defendant alleged that under the terms of the workout plan it could pay all of its outstanding obligations. Defendant argues that by way of its answer to the complaint and its affirmative defense an issue of material fact was created, and, therefore, the trial court should have denied plaintiff's motion for judgment on the pleadings.

On November 15, 2000, the trial court entered an order of liquidation. On November 21, 2000, defendant filed a motion to reconsider and/or vacate the trial court's ruling on plaintiff's motion for judgment on the pleadings and the trial court's order of liquidation. In its motion to reconsider and/or vacate, defendant argued that the trial court thwarted the legislative intent of section 107.27 and section 107.26 to liquidate defendant on a cash flow insolvency basis, which was caused by defendant's adherence to those very statutes. 215 ILCS 5/107.27, 107.26 (West 2000). On December 4, 2000, the trial court denied defendant's motion to reconsider and/or vacate.

On December 15, 2000, defendant filed notice of interlocutory appeal from the trial court's ruling on plaintiff's motion for judgment on the pleadings, the order of liquidation, and the denial of defendant's motion to reconsider. We affirm the rulings of the trial court.

The issues presented for review are whether the pleadings raised questions of fact regarding defendant's solvency; whether the circuit court erred in finding that $4.2 million in assets, which defendant held in custodial accounts in compliance with section 107.27 and section 107.26, could not be counted as available to defendant for purposes of determining whether defendant was insolvent and should be liquidated under section 188; and whether plaintiff's discretion under the Illinois Insurance Code to liquidate a company whose assets exceed its liabilities is absolute, and, if not, whether plaintiff abused that discretion in deciding to liquidate defendant. 215 ILCS 5/107.27, 107.26, 188 (West 2000).

According to defendant, section 107.27 and section 107.26 distinguish exchange syndicates from all other insurers licensed and regulated under the Illinois Insurance Code. Section 107.27 establishes and provides for the regulation of the trust or custodial accounts that

each exchange syndicate must maintain as part of its capital and surplus. Section 107.26 authorizes and defines the duties of the IASA in utilizing those accounts.

●1 Section 107.27 provides in pertinent part:

"[T]he Board may require each syndicate to maintain a trust or custodial account in such amounts as the Board may determine by rule; *** no syndicate may be required to maintain *** an amount in excess of 50% of *** its surplus ***. Any trust or custodial account so established shall be for the benefit of all policyholders and claimants of the syndicate for losses arising out of and within the coverage of insurance risks or obligations underwritten by the syndicate. *** The Board shall provide by rule for the establishment and maintenance of such trust or custodial accounts ***. Any amounts deposited into a trust or custodial account required to be maintained by this Section shall be an asset of the syndicate." 215 ILCS 5/107.27 (West 2000).

●2 Section 107.26(b) outlines the duties of the IASA in the event that an order of conservation, rehabilitation or liquidation is entered. In pertinent part, section 107.26(b) states:

"The Association shall give notice to all policyholders and other persons who may have a claim against the syndicate as shown by the syndicate's records. *** The Association shall then pay all claims for which an insurance obligation exists from the assets of the syndicate's trust or custodial account and certificates of guaranty." 215 ILCS 5/107.26 (West 2000).

In light of these provisions, defendant contends that the trial court wrongly concluded that the assets in the IASA and GF Accounts could only be accessed when a syndicate is either insolvent or ordered to liquidate. Defendant even suggests that the General Assembly *intended* for a solvent syndicate to have access to these accounts so it could pay its obligations and simultaneously quell any threat of insolvency.

●3 To begin, whether a motion was properly granted or denied is an issue of law and is reviewed *de novo*. *Board of Library Trustees v. Cinco Construction, Inc.*, 276 Ill. App. 3d 417, 424 (1995), citing *T&S Signs, Inc. v. Village of Wadsworth*, 261 Ill. App. 3d 1080, 1084 (1994). Unlike a motion for summary judgment, which is a fact motion, a motion for judgment on the pleadings is a pleading motion. Where only a complaint and an answer have been filed, the issue on a motion for judgment on the pleadings is whether the complaint states a cause of action. *Pollack v. Marathon Oil Co.*, 34 Ill. App. 3d 861, 867 (1976). Where the plaintiff moves for judgment on the pleadings, the narrow issue is whether the facts alleged in the answer constitute a legally sufficient defense. In deciding whether to grant or deny a motion for

judgment on the pleadings, the court must determine if the pleadings present a material issue of fact. *Pollack v. Marathon*, 34 Ill. App. 3d at 867. If the pleadings contain a material issue, the motion must be denied, since a motion for judgment on the pleadings does not test whether there is any evidence to support the factual allegations in the pleading. *Pfeil v. Weerde*, 152 Ill. App. 3d 759, 760 (1987). Where the well-pled allegations in the complaint are subject to more than one reasonable interpretation, the entry of judgment on the pleadings is improper. *Egan v. Steel*, 137 Ill. App. 3d 539, 543 (1985).

•4 In consideration of the foregoing law, we find that based on defendant's express admissions contained in its answer and affirmative defense, defendant admitted that it was insolvent from a cash flow standpoint. Defendant readily admitted that the money held in the IASA and GF Accounts was not readily accessible to defendant. Since the funds in these custodial accounts were not available to defendant, defendant had insufficient accessible assets to pay its outstanding claim obligations. Thus, there is no issue of material fact as to whether defendant was solvent or insolvent at the time the complaint was answered; defendant was insolvent.

Next, we find that an examination of section 107.27(a) reveals that this section does not support defendant's contention that it should have been able to utilize the funds set aside in its IASA and GF Accounts. Section 107.27(a) authorizes the board of INEX to require syndicates to maintain trust or custodial assets for the benefit of the syndicate's claimants and policyholders. Section 107.27(a) simply states that the money in these accounts should be disbursed in accordance with section 107.26. Moreover, section 107.27(a) clearly states that whether these accounts are liquidated is not up to the discretion of the syndicate; rather, the process outlined in section 107.26 must be followed.

•5 Section 107.26(b) does indeed indicate that the General Assembly provided for the possibility of the IASA and GF Accounts being tapped when a syndicate becomes insolvent. However, nowhere in section 107.26 is there language indicating that the steps outlined in this section must be followed *before* a finding of insolvency can be made. This section leaves open the possibility that a syndicate may first be found insolvent before tapping into these accounts. This section, however, does leave open the possibility that these accounts may be tapped into in an effort to save a syndicate from impending insolvency. Similarly, section 107.08 does not require that the plan outlined in section 107.26(b) be implemented *prior* to finding that a syndicate is insolvent. Section 107.08 provides in pertinent part:

"Rehabilitation, conservation or liquidation. If the Board or

Director of Insurance determines after an examination, audit or pursuant to an Exchange internal hearing, that a syndicate has become insolvent or financially impaired to the extent that its further transaction of business is hazardous to its policyholders, its creditors, or the public, it shall order the syndicate to cease and desist from assuming insurance or reinsurance obligations on the Exchange or take such other action for the protection of policyholders and creditors as provided in this Article.

Upon issuing a cease and desist order as provided in this Section, The Board shall notify the Director of Insurance of such action. If the Director determines the syndicate to be insolvent or financially impaired, the Director shall report that determination to the Attorney General. The Attorney General shall apply forwith by complaint *** for an order to rehabilitate, conserve, or liquidate the defendant syndicate as provided in Article XIII of this Code and for such other relief as the nature of the case and the interests of the policyholders, creditors, or the public may require." 215 ILCS 5/107.08 (West 2000).

Additionally, section 107.15(f) states that the board of trustees shall have immediate access for the benefit of the IASA to the trust or custodial accounts and the certificates of guaranty of either an impaired or insolvent syndicate. Since section 107.15(f) allows the custodial accounts to be accessed for either a financially impaired or an insolvent syndicate, it would be against the plain language of the Illinois Insurance Code to find that these accounts must be accessed in order to "save" a syndicate from insolvency. A determination of when these accounts are to be accessed is left to the discretion of the Director.

Thus, we hold that, contrary to defendant's argument, none of the aforementioned statutes require the Director to implement the "release of funds" procedure set forth in section 107.26(b) prior to finding a syndicate insolvent. To read such a meaning into the language of these statutes would be to ignore the plain and unambiguous language used by the General Assembly in drafting these statutes. These statutes are silent as to whether section 107.26(b) must be implemented as a prerequisite to a finding of insolvency. In remaining silent on this issue, it appears that it is in the Director's discretion as to whether section 107.26(b) should be implemented in an effort to save a syndicate from insolvency. Further, section 107.08 and section 188 give the Director full discretion to choose between either rehabilitation or liquidation. 215 ILCS 5/107.08, 188 (West 2000). Perhaps the General Assembly anticipated the Director finding that only in some instances would it be wise to implement section 107.26(b) prior to making a finding of insolvency, while in other instances implementing

section 107.26(b) prior to making a finding of insolvency would be in vain. Since the plain and unambiguous language of the aforementioned statutes does not require the Director to implement the procedure outlined in section 107.26(b) prior to finding a syndicate to be insolvent, we hold that the Director was not premature in finding defendant insolvent, and, therefore, the trial court did not err in granting plaintiff's motion for judgment on the pleadings.

Defendant acknowledges that the Director has broad discretion in determining whether a syndicate is insolvent; however, defendant claims that the Director's right to liquidate a company is not absolute. In *Dorfman v. Gerber*, 29 Ill. 2d 191, 196 (1963), the Illinois Supreme Court held:

"The courts have been most careful to avoid encroaching upon the discretionary power lodged in a public officer. That does not mean, however, that they are helpless and that all administrative decisions are sacred and not within reach of the courts. Where an administrative order is against the manifest weight of the evidence, [citations] or the officer had acted arbitrarily and capriciously and thereby abused the discretionary power vested in him, we will not hesitate to intervene. [Citations.]"

In *Dorfman*, the Illinois Supreme Court reviewed an administrative decision of the then Director of Insurance revoking the broker's and agent's licenses of the plaintiffs. *Dorfman*, 29 Ill. 2d at 192. The Illinois Supreme Court found that the findings and recommendation of the hearing officer, which were adopted by the Director of Insurance, were not supported by the record "and were clearly arbitrary and capricious and constituted an abuse of discretionary power." *Dorfman*, 29 Ill. 2d at 197. Consequently, the Illinois Supreme Court reversed the judgment of the appellate court and the order of revocation issued by the Director and affirmed the judgment of the circuit court. *Dorfman*, 29 Ill. 2d at 197. In consideration of *Dorfman*, we conclude that the power of the Director is absolute only insofar as his finding is not against the manifest weight of the evidence.

•6 In the case at bar, there is conclusive evidence of defendant's insolvency, and, consequently, we find that the Director's finding of insolvency was not against the manifest weight of the evidence. In its answer and affirmative defense, defendant readily admitted that it did not have a cash surplus and only hoped to have such a surplus after implementation of its proposed workout plan and/or release of the funds in the custodial accounts pursuant to section 107.26(b). Upon making a finding of insolvency, the Director is expressly authorized by section 192(4) to submit a rehabilitation plan to the court for its approval if it finds doing so is in the best interest of the policyholders,

creditors, and company. 215 ILCS 5/192(4) (West 2000). Section 190 sets forth the duty of the trial court:

"Upon the hearing, at which the complaint and any exhibits filed therewith shall be received as prima facie evidence of the facts therein recited, the court shall enter an order either dismissing the complaint or finding that sufficient cause exits for rehabilitation or liquidation and directing the Director to take possession of the property, business and affairs of such company and to rehabilitate or liquidate the same as the case may be. The Director shall be responsible on his official bond for all assets coming into possession." 215 ILCS 5/190 (West 2000).

In light of these provisions, it is plainly clear that it is at the discretion of the Director whether a rehabilitation plan is submitted to the trial court or an order of liquidation is requested. Moreover, a plethora of case law cited to by plaintiff shows that Illinois courts, including the Illinois Supreme Court, recognize that pursuant to the Illinois Insurance Code, only the Director is authorized to supervise in instances of liquidation or rehabilitation. *Central Standard Life Insurance Co. v. Gardner*, 17 Ill. 2d 220, 232 (1959); *American Surety Co. v. Jones*, 384 Ill. 222, 231 (1943); *In re Liquidation of Security Casualty Co.*, 127 Ill. 2d 434, 447 (1989); *In re Liquidation of Coronet Insurance Co.*, 298 Ill. App. 3d 411 (1998).

As long ago as 1899 the appellate court defined insolvency as the present inability to pay debts and stated that "[i]t does not follow that a man is not insolvent because he may ultimately have a surplus upon the winding up of his affairs." *Chicago Title & Trust Co., Receiver of the Globe Savings Bank v. Household Guest Co.*, 88 Ill. App. 126, 129 (1900). This court went on to state:

"On the other hand, if it can be reasonably found that he can, by proper use of his means, promptly recover from a merely temporary embarrassment caused by some unforeseen contingency, and carry on his business and meet his engagements in the ordinary course, he ought not to be deemed insolvent, because he temporarily failed to meet his obligations." *Chicago Title & Trust Co., Receiver of the Globe Savings Bank v. Household Guest Co.*, 88 Ill. App. 126, 129 (1900).

According to Black's Law Dictionary, an entity is defined as insolvent when it has "stopped paying debts in the ordinary course of business" or is unable to pay its debts as they fall due. Black's Law Dictionary 799 (7th ed. 1999).

In the case at bar, no evidence was presented showing that defendant could *promptly* recover or meet its obligations in the *ordinary* course of business. The Director was justified in finding that liquidation of defendant was appropriate. Thus, the trial court correctly

determined that the Director's order of liquidation was not against the manifest weight of the evidence, and, therefore, the trial court had no basis for overruling that determination or ordering implementation of the workout plan.

●7 Lastly, we find that defendant's argument largely focuses on the alleged downside of liquidation (administration costs, delayed payment claims, etc.). The narrow issues before us in the instant case do not allow this court to comment on the general subject of the advantages and disadvantages of liquidation under the Illinois Insurance Code. Thus, contrary to defendant's contention that the matter at bar requires an examination of the entire statute and a consideration of the purposes of the legislation, we find that such an examination would be inappropriate. From defendant's argument, it is clear that defendant truly believes that had the workout plan been instituted, this would have been in the best interests of defendant's policyholders, creditors, and the public. However, defendant has failed to point to any section of the Illinois Insurance Code that requires the Director to implement a rehabilitation or workout plan prior to making a finding of insolvency. Since the record shows that plaintiff was justified in finding defendant to be insolvent, we conclude that the Director was not obligated to institute the proposed workout plan.

For the foregoing reasons, we affirm the trial court's decision to grant plaintiff's motion for judgment on the pleadings, grant the order of liquidation, and deny defendant's motion to reconsider.

Affirmed.

QUINN, P.J., and THEIS, J., concur.