The Millikin Trust Company, a Corporation, as Executor and as Co-trustee Under the Last Will and Testament of Everett P. Jarvis, Deceased, Plaintiff-Appellee, v. Blanche G. Jarvis, etc., Defendant-Appellee, and Vernon D. Jarvis et al., Defendants-Appellants.

Gen. No. 10,358.

Third District.

February 19, 1962.

Rehearing denied March 29, 1962.

Bookwalter, Carter, Gunn & Hickman, all of Danville, Arthur J. B. Showalter, of Champaign, and Edwin

C. Mills, of Lincoln, guardian ad litem for all minors and Trustee for all unborn parties joining in appeal, for appellants.

Fribley & LaCharite, of Pana, and Dowing, Smith, Prince, Jorgensen & Uhl, of Decatur (John W. Fribley, of Pana, Elbert S. Smith and Robert R. Uhl, of Decatur, of counsel), attorneys for defendant-appellee, Blanche G. Jarvis. Boland, Delahunty & Brown, of Decatur, for appellee, Harris & Harris, of Lincoln, attorneys for plaintiff-appellee, The Millikin Trust Co.

ROETH, PRESIDING JUSTICE.

Everett P. Jarvis, a resident of Peoria, departed this life on April 7, 1947. He left a last will and testament dated December 16, 1942, which was probated in Peoria County. By the first clause of his will he directed payment of all debts, etc., and that:

". . . subject thereto, my estate, real, personal and mixed, of whatsoever nature and wheresoever situate, which I may own or have the right to dispose of at the time of my decease, be disposed of as hereinafter directed."

By clause 2 he directed payment of all taxes as part of the expense of administration; by clause 3 he gave the executor power to compromise and settle all claims in favor of his estate and by clause 4 he gave certain personal property to his wife as her absolute property. The balance of the will is as follows:

"ITEM 5. All the rest, residue and remainder of my property and estate, I give, devise and bequeath to The Millikin Trust Company, a Corporation, of Decatur, Illinois, or to its corporate successor or successors, and my wife, Blanche G. Jarvis as co-trustee, IN TRUST NEVERTHE-LESS, for the uses and purposes herein set forth.

183

"During the period of trusteeship, said Trustees shall hold, manage, lease, care for, preserve and protect said trust estate and collect the income therefrom, all in accordance with their best judgment and discretion, except as such powers may be herein otherwise restricted; said Trustees are directed to pay, out of funds of the trust, all expenses of operation, maintenance and upkeep of the trust property, and from the trust income to build up a sufficient reserve for depreciation in order to maintain the corpus of the trust estate; and any leases that may be made by the Trustees may be for any term of years that said Trustees may think best, even if they extend beyond the period of the trust. Said Trustees may retain and continue as a portion of said trust estate any investments received by them from my estate, and also any business in which I may be interested at the time of my death, all except as herein otherwise provided, and they are hereby fully authorized to invest such part of the corpus of said trust estate as may from time to time be converted into cash in bonds of the United States of America, or of any State of said United States. Said Trustees are hereby given full power, except as herein otherwise restricted, to sell and convey any and all of said trust property and any reinvestments thereof, from time to time, for such prices and upon such terms as they shall see fit, either for the purpose of reinvestment or of carrying out any provision of this trust. No purchaser shall be obliged to see to the application of the purchase money. The Trustees may employ counsel and other agents in the discharge of their duties and determine and pay them reasonable compensation. The Trustees shall be entitled to receive as compensation for their services hereunder such amounts as from time to time during the contin-

184

uance of the trust shall be the usual and customary charges of trustees in trusts of like nature, or as may be fixed or determined from time to time by the laws of the State of Illinois.

"ITEM 6. The entire net income from said trust estate shall be paid to my said wife, Blanche G. Jarvis, as long as she lives, in monthly payments. Should the net trust income in any year be insufficient to pay my said wife in that year a total of Twelve Thousand Dollars ($12,000.00) then said Trustees may sell any of the trust property my said wife may direct the Trustees to sell in order that the payments to her for that year may be brought up to the sum of Twelve Thousand Dollars ($12,000.00), and should the property so sold bring more than the amount necessary to make up the Twelve Thousand Dollars ($12,-000.00) allowance to her for that particular year the surplus proceeds thereof shall be held by the Trustees to apply on future payments to her for years when the trust income fails to net Twelve Thousand Dollars ($12,000.00) available for payment of said yearly allowance. Such sales shall be public sales to the highest bidder except as hereinafter otherwise directed, and the property to be sold shall be selected in conformity with the directions hereinafter written.

"ITEM 7. In making sale of my oil properties of any and every kind and description, whether the same be then developed or not, or any of my interests in such properties, and in developing any of the same, and in the management, development, operation or sale of any and all properties, businesses or enterprises in which, at the time of my death, I am interested jointly or in common with my business associates, being my brother, Samuel D. Jarvis, and my friend, Albert M. Marcell, they shall be consulted by my Trustees and

185

their advice be acted upon. Should they both be unavailable for consultation and advice as to any sale of such properties, or should they be unable to agree in giving advice as to such sale, then said Trustee shall advertise and make public sale or sales of such properties to the highest bidder. Should my said business associates desire to purchase any of my said oil properties or any of my interests in such properties, or any of my interests in any joint venture, enterprise, property or business in which I am associated or engaged with them, then they shall have the first right to purchase the same from my said Trustees at and upon such terms as may be agreed upon by them and my said Trustees at the time or times of sale. Should one only of my said business associates desire to make any such purchase and the other of them not desire to join therein then the one of them desiring to make such purchase may have the first right to do so.

"ITEM 8. All my interest in the automobile business in which I may be engaged or in which I may be interested at the time of my death shall be sold. Any partner I may have in such business at any one location (should my automobile business interests be in concerns located at different points) shall have the first chance to purchase my interest in the business at that location, such purchase to be at a price to be determined either by its book value according to the records being maintained by the business at that location or by its appraised value, whichever may be the higher. Should no partner decide to purchase then my said interest shall be sold according to the policy of the Chevrolet Motor Company.

"ITEM 9. In making sales of trust property by said Trustees under the powers herein given

186

I desire that said Trustees first dispose of trust property other than my Illinois farm lands, as it is my wish that, if possible, such farm lands be kept free from invasion of principal until after the other trust estate has been exhausted.

"ITEM 10. In the event that any of my residuary estate has its situs in any state or jurisdiction in which the said The Millikin Trust Company lacks legal authority and power to act as one of my testamentary Trustees, then it is my will that such person as then may be the President of the said Trust Company or its corporate successor or successors shall be and act as co-trustee with my wife aforesaid in such state or jurisdiction as to any residuary trust estate therein. Such persons as may succeed said President as his successors in said corporate office shall in turn be and act as his successors in trust. All proceeds of the trust estate and net income of the trust estate coming into their hands shall by them be turned over to said Trust Company and my said wife as co-trustees and the same then be handled by the latter co-trustees as income and proceeds of the trust in their control. The certificate of the Secretary of the said The Millikin Trust Company, or of its corporate successor or successors, duly acknowledged by him and bearing the corporate seal of said Trust Company or of its corporate successor or successors, stating the name of such President and that he is such President, shall be sufficient evidence of such President's official status as such President.

"ITEM 11. Upon the death of my wife, Blanche G. Jarvis, the surviving Trustee shall pay the expenses of her funeral and decent burial, and final distribution of said trust estate then remaining, including lapsed legacies, if any, shall

187

be made by said surviving Trustee and said trust terminate. Such distribution shall be in equal shares to my brother, Samuel D. Jarvis, and my two sisters, Madge J. Giddens and Moneta J. Kiick, or to the survivors of them should any of them be dead at that time leaving no issue then living. If any of them be then dead leaving issue living at the time of such distribution then such issue shall receive the share their deceased parent would have taken had he or she been then living, per stirpes and not per capita. In making such final distribution the surviving Trustee may, in its uncontrolled discretion, make distribution to all or any of the distributees in money or property of the trust estate, or partly in money and partly in property of the trust estate, and the judgment of the surviving Trustee as to the selection of such property to be distributed, and the valuation thereof, shall be binding and conclusive upon the distributees.

"ITEM 12. I do hereby appoint the said The Millikin Trust Company, a Corporation, of Decatur, Illinois, or its corporate successor or successors, to be the Executor of my will.

"ITEM 13. I hereby revoke any and all other wills and codicils heretofore made by me."

The testator had no children so that at the time of his death, his heirs consisted of his widow, Blanche Jarvis, and his brother and two sisters. The widow, at that time, was approximately 60 years of age. The brother and sisters surviving him were Samuel Jarvis, Moneta Kiick and Madge Giddens. Samuel Jarvis died after the testator, but before the institution of this litigation. He, Samuel Jarvis, left a son, Vernon D. Jarvis, who is one of the parties to this suit. Vernon Jarvis has five minor children, all of whom are parties to this suit. Moneta Kiick is also a party.

The descendants of Moneta Kiick who are parties hereto are Jean K. Heft and Iona K. Seefeldt. Jean K. Heft has two children, Judy Heft and David Heft, both of whom are minors, and Iona Seefeldt also has two children, James and Anita Seefeldt, both of whom are minors and are represented herein by a guardian ad litem. Madge Giddens, who is a party, has no children.

It is apparent from the foregoing provisions of the will of Everett P. Jarvis, that said will was carefully and skillfully drafted and that it is clear, unequivocal and unambiguous. It is likewise apparent that the testator had a twofold purpose in mind (1) to make adequate provision for his wife as long as she lived and (2) to provide for his lineal descendants upon the death of his wife.

At the time of his death the testator owned approximately 1800 acres of good Illinois farm land, interests in two automobile agencies, some land in Texas of small value, various moneys, investments and chattel property. In addition he owned interests in certain oil leases, certain oil and gas royalties and an interest in certain oil and gas leases in Louisiana property. There came into the hands of the executor of his estate from monies in banks, sales of properties negotiated prior to his death, sale of grains, etc., prior to death, sales of his interests in the two automobile agencies and sale of a building in Cairo, a net amount of $697,638.87. The funeral expenses, costs of administration, Federal and State taxes amounted to a total of $1,174,508.34, of which Federal estate taxes accounted for almost three-fourths, leaving a deficit of $476,869.43. When this deficit became apparent, the Internal Revenue Department asserted a lien against the Louisiana property above, and refused to release the lien until provision was made to guarantee the payment of the Federal estate taxes. Thereupon ancillary administration was

commenced in Louisiana and the Louisiana property was sold. The net proceeds of sale amounting to $517,-824.75 were sent to the Illinois executor which, together with the $697,638.87 already in its hands were used to satisfy the claims, expenses of administration and all Federal and State taxes.

The proceedings to sell the Louisiana property were conducted in the De Soto Parish Judicial Court. The petition filed by the ancillary administrator reveals that it refers to the Louisiana property as the community property of the deceased and his wife. The order of sale thereafter entered likewise refers to the Louisiana property as community property of the deceased and his wife. The authority for distribution of the entire net proceeds of sale of the Louisiana property to the Illinois executor is contained in two letters of authorization, one from the widow to the ancillary administrator as follows:

"In order to secure release from the Federal Estate Tax Lien on the oil and gas lease interests in the Spider Field, DeSoto Parish, Louisiana, belonging to the community formerly existing between Everett P. Jarvis and me, you are hereby authorized to obligate yourself to the Commissioner of Internal Revenue to remit the Millikin Trust Company (as domiciliary executor of the estate of Everett P. Jarvis), the entire net proceeds (both as to the interest of Everett P. Jarvis and as to my community interest) remaining to the credit of the estate being administered in Louisiana upon completion of the administration in accordance with the laws of the State of Louisiana.

"You are further authorized to collect and receipt for the purchase price which may be paid for my interest in all property belonging to the community formerly existing between Everett P. Jarvis and me in the State of Louisiana, and to

190

remit such sums to The Millikin Trust Company as domiciliary executor of the Estate of Everett P. Jarvis."

and one to the Illinois executor as follows:

"In order to secure release of the Federal Estate Tax Lien from the oil and gas lease interests in Spider Field, DeSoto Parish, Louisiana, belonging to the community formerly existing between Everett P. Jarvis and me, you are hereby authorized to segregate all sums remitted to you by The First National Bank of Shreveport from the ancillary administration in Louisiana (whether received from the sale of the interest of the decedent or of my community interest in the Louisiana properties) and to apply such sums toward the payment of Federal Estate Taxes to the extent necessary, including the entire amount so remitted if required for that purpose.

"You are further authorized so to obligate yourself to the Commissioner of Internal Revenue.

"I reserve, however, the right to an accounting between the community estate and the separate estate of Everett P. Jarvis."

The controversy in this case is between the life cestui que trust (the widow) and the remaindermen (the brother and sister and descendants of the deceased brother). It involves two basic questions, both of which are legal questions, namely, (1) are the proceeds from working interests and royalties derived from oil and gas wells in operation at the time of decedent's death to be treated as income and distributed to the widow under clause 6 of the will or are they to be treated as corpus to be reinvested and the income from the reinvestment paid to the widow, and (2) is the Louisiana property community property and if so who is entitled to the proceeds of sale of that property.

191

All other issues are collateral to these two main issues and can be resolved by a proper accounting when the two main issues are resolved.

As heretofore noted the oil and gas wells were in operation at the time of decedent's death. Up until the time this suit was commenced the Trustees had collected in excess of 3 million dollars from the working interests and royalties of decedent in these wells. Proceeds are still being collected but as is common to all such interests they are regarded as wasting assets which in time will become exhausted.

 Considering the first question involved, the briefs of counsel discuss in some detail the so-called "open mine" doctrine. This doctrine established as a rule of law, that a life tenant of land or a mineral fee interest in land as to which the original settlor had opened mines or oil wells in his lifetime, was privileged to continue the operations and to appropriate to his own use the proceeds derived from the opened mines or wells. The early Illinois cases recognized this rule. As a corollary to this rule it was held that a life tenant could not open new mines or wells and appropriate the proceeds to his use, for to permit such to be done would constitute waste as to the remaindermen. As the law in Illinois devloped, a further rule was evolved namely, that a life tenant might open new mines or wells if the proceeds were treated as standing in place of the land and invested and the income from the investment paid to the life tenant. This rule undertook to circumscribe the waste principle above referred to. Sewell v. Sewell, 363 Ill 166, 1 NE2d 492. Attention is called to the recent case of Central Standard Life Ins. Co. v. Gardner, 17 Ill2d 220, 161 NE2d 278. In that case oil and gas wells were opened by the Trustee and became productive after the trust was created. The sole question involved was whether

the proceeds from the oil and gas should be treated as income, or principal so as to constitute part of the corpus of the trust. The Supreme Court clarified its prior holdings (which held that the opening of new wells by a life tenant constituted waste as against the remaindermen) in the following language:

"From the prior decisions of this court in Ohio Oil Co. v. Daughetee, 240 Ill 361, and Sewell v. Sewell, 363 Ill 166, which span the period of creation of the trust here in issue, it is the established rule in this State that royalties and bonuses, received as consideration for the permanent severance of natural resources such as oil and gas, are principal as distinguished from income and constitute part of the corpus of a trust to be reinvested to maintain the productivity of the estate. In the Sewell case we said, beginning at page 171: 'In the Ohio Oil Co. case, supra, we held that for a life tenant to operate for oil would constitute waste which a court of equity would enjoin, and that a tenant for life has no such right. . . . we must presume that when the probate court in Arkansas approved the lease of these oil lands on behalf of the infant appellees it did so for the benefit of the entire estate, and anticipating that the oil produced, as well as the preliminary bonus for the lease, would be considered a part of the land, the same above ground as it had been below. Similar situations have been so treated by many courts, and we believe this to be the just rule. . . . For the reasons which we have indicated we hold that all the funds which have arisen from the oil and gas lease in question shall be considered as a corpus, the fee of which is in the infant appellees (remaindermen) . . . .' 363 Ill 171–173."

193

■■■■■■■■■■■■

The court then went on to comment that the principles above enunciated were recognized by Section 10 of the Principal & Income Act adopted 1941, which although not applicable because prospective in its operation only, was in accord with the prior holdings of the Illinois courts. The Supreme Court also cited with approval the case of Sternberg v. St. Louis Union Trust Co., 163 F2d 714, which involved the question of whether proceeds from coal being mined by the stripping process were income or principal. In that case the mine was open at the testator's death and it was held that the proceeds of the coal were principal to be reinvested as part of the corpus as distinguished from income. Thus, having referred to Sewell v. Sewell (an unopened well case) and Sternberg v. St. Louis Union Trust Co. (an open mine case) with approval the significant part of the opinion is contained in this language:

> "We can see no distinction in the nature of oil and gas royalties and bonuses as to being principal or income, depending on whether they have been realized in the past or will be realized in the future. One is a certainty and the other a speculative expectancy, but in either case they must be of the same nature and subject to the same rules."

Thus, without reference to the Principal & Income Act, the court was holding that proceeds from wasting mineral assets, whether developed before or after a testator's death should, as between a life tenant and remaindermen, be treated as principal to constitute a part of the corpus of the trust to be reinvested, as distinguished from income.

■■■ Aside from the foregoing, the Principal & Income Act became effective in July, 1941. Ill Rev Stats 1959, c 30, Sections 159 to 176. The will of the deceased was executed almost 1½ years after the effec-

tive date of this act and became effective upon his death in 1947. It is to be presumed that he had knowledge of the provisions of this act at the time of the execution of his will. Section 2 of this act provides as follows:

"This Act shall govern the ascertainment of income and principal, and the apportionment of receipts and expenses between tenant and remainderman, in all cases where a principal has been established with or, unless otherwise stated hereinafter, without the interposition of a trust; except that in the establishment of the principal provision may be made touching any or all matters covered by this Act, and the person establishing the principal may himself direct the manner of ascertainment of income and principal and the apportionment of receipts and expenses or grant discretion to the trustee or other person to do so, and such provision and direction, where not otherwise contrary to law, shall control notwithstanding this Act."

Section 10 of the act provides:

"Disposition of natural resources. Where any part of the principal consists of property in lands from which may be taken timber, minerals, oils, gas or other natural resources and no provision is made in the transaction by which the principal was established for the disposition of the net proceeds thereof after the payment of expenses and carrying charges on such property, such proceeds, if received as rent on a lease, shall be deemed income, but if received as consideration, whether as royalties or otherwise, for the permanent severance of such natural resources from the lands, or as a bonus for a lease, shall be deemed principal to be invested to produce in-

195

come. Nothing in this section shall be construed to abrogate or extend any right which may otherwise have accrued by law to a tenant to develop or work such natural resources."

Appellees contend that the deceased in the case at bar has himself *directed* the manner of ascertainment of income and principal. We find nothing in this will upon which to predicate this contention. Only by a most strained and devious construction could such a conclusion be reached.

■ It is also contended that the use of the phrase "from which may be taken oil or gas", refers only to unopened wells and that therefore Section 10 can have no application to the situation at bar. It would appear that some confusion has existed among attorneys over the use of this phrase. (See comments of John Mann, Asst. Gen. Counsel Chicago Title & Trust Co. in A Review of Legislation enacted by the 72nd General Assembly page 65.) However, in our opinion, these words allude to property and lands and interests therein upon which oil and gas have been discovered or may be discovered and produced. The word "may" is descriptive of the nature of or ability of the land to produce oil and is not a limitation of the application of the Act to property where the discovery of oil and gas occurs in the future as distinguished from proven oil and gas property from which oil and gas are presently being produced. This is especially true in view of our foregoing analysis of the Central Standard Life Insurance Co. case, supra.

■ We therefore conclude that the proceeds from oil and gas whether from working interests in wells or royalties are to be treated as principal as distinguished from income and constitute part of the corpus of the trust established by Everett P. Jarvis, to be reinvested by the trustees with the income from the reinvest-

ments to be paid to the life cestui que trust pursuant to clause 6 of the will.

We now consider the second question involved in this case. The testator during the years 1943 to 1945 had purchased undivided ⅓ interests in gas leases covering various tracts of real estate situated in De-Soto Parish, Louisiana. The cost thereof to the testator was $36,199.32, which was paid out of his separate Illinois bank account. The instruments of conveyance by which testator acquired these interests did not contain a recitation to the effect that the purchase was made "with the separate funds of Everett P. Jarvis" and "for his separate estate." These properties were sold under the circumstances hereinbefore set forth and the controversy in the case before us involves the title to the proceeds of sale.

■■■■■ Louisiana is a community property state. Even though the testator was a nonresident of Louisiana at the time he acquired the interests in the gas leases, this property is subject to the community property laws of Louisiana. Louisiana Civil Code, Article 9 and Article 2400; Cox v. Von Ahlefeldt, 105 La 543, 30 So 175. The law is well settled in Louisiana that the acquisition of property by a husband during marriage without a declaration in the deed, not only that the property was acquired with his separate funds, but also that it was for his separate estate, *conclusively* precludes him from contending that the property does not belong to the community. The leading case announcing this rule is Slaton v. King, 214 La 89, 36 So2d 648. This rule was affirmed in Bruyninckx v. Woodward et al., 217 La 736, 47 So2d 478, and in a number of cases of the Court of Appeal of Louisiana at late as 1961 in Succession of Blades (La App), 127 So2d 263. The only exception to the rule is where he exchanges his separate property for other immovables. In such case there is merely a substitution for

197

the property given in exchange and it has the same status or ownership. Kittredge v. Grau, 158 La 154, 103 So 723. The acquisition in the case at bar is a purchase and not an exchange and therefore does not fall within the exception. In view of the repeated enunciation of the above rules by the courts of Louisiana, we do not regard McKay's comments (Sec 423) in his 1925 edition of Community Property as any authority to the contrary. We therefore conclude that upon acquisition of the Louisiana gas leases by testator, his wife became vested with a ½ interest therein under the community property law of Louisiana. Counsel for the remaindermen contend that the widow cannot assert the right to take under the terms of the will and at the same time claim a ½ interest in the Louisiana property in opposition to the estate. There is no merit in this contention. The wife became vested with her ½ interest in the community property immediately upon its acquisition. Succession of Wiener, 203 La 649, 14 So2d 475. In our opinion it follows, that by insisting she owns a ½ interest in the property she is not asserting a right in opposition to the will while at the same time taking the benefits given by the will. Nor was she put to any election to renounce her ½ interest if she desired to obtain the benefits of the will.

█ In connection with the determination that the widow acquired a ½ interest in the Louisiana property under the community property laws of that state, it should be also noted that it is the settled law of Louisiana that her ½ interest is chargeable with (a) ½ the cost of acquisition and (b) ½ the cost of administration of the estate in Louisiana. Succession of Watkins, 156 La 1000, 101 So 395.

█ █ Counsel for the life cestui que trust further contend that the will and testamentary trust of

198

Everett P. Jarvis is invalid under the Louisiana law and his community ½ interest in the Louisiana property thereupon descends to his widow as intestate property under the provisions of Article 915 of the Louisiana Civil Code. This contention is predicated upon the provisions of Article 1520 of the Louisiana Civil Code. On the other hand counsel for the remaindermen contend that Article 1520 does not apply to the Jarvis trust and that said trust is valid under Article 1522. Articles 1520, 1521 and 1522 are as follows:

"ARTICLE 1520—LOUISIANA CIVIL CODE—SUBSTITUTIONS AND FIDEI COMMISSA ABROGATED.

Substitutions and fidei commissa are and remain prohibited. Every disposition by which the donee, the heir, or legatee is charged to preserve for or to return a thing to a third person is null, even with regard to the donee, the instituted heir or the legatee. In consequence of this article the trebellianic portion of the civil law, that is to say, the portion of the property of the testator, which the instituted heir had a right to detain, when he was charged with a fidei commissa or fiduciary bequest is no longer a part of our Law.

ARTICLE 1521—LOUISIANA CIVIL CODE—FIRST DONEE REFUSING TO TAKE—GIFT OVER VALID.

The deposition (disposition), by which a third person is called to take the gift, the inheritance or the legacy, in case the donee, the heir or the legatee does not take it, shall not be considered a substitution and shall be valid.

199

ARTICLE 1522—LOUISIANA CIVIL CODE—
USUFRUCT TO ONE, NAKED OWNERSHIP TO
ANOTHER VALID.

The same shall be observed as to the disposition inter vivos or mortis causa, by which the usufruct is given to one, and the naked ownership to another."

The application of these Articles of the Civil Code considered in the leading case of Succession of Fertel, 208 La 614, 23 So2d 235, where the court applied the Articles and said:

"Here, the testatrix did not declare she left her property to her husband, but declared that she left 'the use of it' to her husband, and that at his death it should go to her two daughters and her grandson. By the term 'use of it' the testatrix meant the usufruct of the property, not the ownership of it. The expression that 'at his death' it should go to the two daughters and the grandson of the testatrix meant merely that the possession of the property should be delivered to them at the death of the husband, who was to enjoy the use of it during his lifetime. The expression 'at his death' did not mean that the title to the property should be vested in the husband of the testatrix, and at his death should pass from him to the two daughters and the grandson. It meant merely that the possession and use, or usufruct, of the property, should be enjoyed by the husband until his death, and that during his lifetime only the naked ownership should be vested in the two daughters and the grandson of the testatrix."

The simplest test of the substitution prohibited by Louisiana law is that it vests the property (ownership) in one person at the death of the donor and at the death of such person vests the same property in an-

other person, who takes directly from the testator but by a title which springs into existence only at the death of the first donee. Such a disposition destroys the power of alienation of the property by the first donee, because he is bound to hold it until his death in order that the person then called to title may take it. At the same time no power of alienation exists in the second donee during the life of the first, because his title comes into being only at the death of the latter. From a consideration of the rules thus announced we conclude that the trust created by the will of Everett P. Jarvis does not come within the prohibition of Article 1520 of the Civil Code and that it is valid in Louisiana. Consequently the ½ interest of Everett P. Jarvis in the community property is a part of his estate and ½ of the proceeds of sale of it were properly received by the executor of his will. As to the other ½ of the proceeds of sale, they belong to the widow Blanche Jarvis and she is entitled to an accounting for the same. In this connection Blanche Jarvis contends that since her ½ of the proceeds were used to pay Federal Estate Taxes under the circumstances hereinbefore outlined, she should, on the accounting, be entitled to interest thereon at 5%. With this contention we do not agree. Although technically Blanche Jarvis advanced her ½ of the proceeds of sale to the Illinois executor to remove the federal tax lien, nevertheless it was to her beneficial interest (to prevent the sale of other properties from which she would ultimately receive income) to do so.

The executor of the will of Everett Jarvis should now proceed to close the estate and render an accounting of its acts in so doing. The trustees should likewise render an accounting and the trust created by the will of Everett Jarvis should be set up and administered in accordance with the views herein expressed, adjusting overpayments or underpayments to the life

201

cestui que trust as the case should be, by the accounting.

Accordingly the decree of the Circuit Court of Logan County is reversed and the cause is remanded with directions to proceed in accordance with the views herein expressed.

Reversed and remanded with directions.

REYNOLDS and CARROLL, JJ., concur.