Ann McLAUGHLIN, Successor to William E. Brock, Secretary of the United States Department of Labor, Plaintiff,

v.

John H. ROWLEY, Harry C. Herrington, Robin Wightman, Dale Chappell, Wade Wallace, W.L. Baxter, David Chaffin, and Ed Cernosek, Defendants.

No. CA–3–83–1285–T.

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 24, 1988.

T. Timothy Ryan, Jr., Sol. of Labor, Robert N. Eccles, Acting Associate Sol., Plan Benefits Security Div., Norman P. Goldberg by Charles R.P. Pouncy, Sherwin S. Kaplan, G. William Scott, Stephen J. Kessler, U.S. Dept. of Labor, Office of the Sol., Plan Benefits Security Div., Washington, D.C., for Fiduciary Litigation.

Charles Ory, U.S. Attorney's Office, Dallas, Tex., for plaintiff.

Claude R. Wilson, Jr., George Garrison Potts, Alan J. Hostetter, Golden, Potts, Boeckman & Wilson, Dallas, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MALONEY, District Judge.

This case was filed by the Secretary of the United States Department of Labor ("Plaintiff" or the "Secretary") on July 26, 1983. Plaintiff filed this suit under the Employee Retirement Income Security Act ("ERISA"). Plaintiff alleges that Defendants, who are trustees of the Rowley United Pension Fund ("the Plan"), violated the "prudence," "exclusive purpose," and "prohibited transaction" provisions of ERISA. Plaintiff contends that these alleged violations occurred through the Plan's lending Plan assets to certain participants, including Defendants themselves, at interest rates significantly below reasonable or fair market rates. Plaintiff further contends that Defendants violated ERISA provisions by failing to administer the loans in a prudent manner.

On October 19, 1987 Plaintiff and Defendants tried their case to the Court. Having considered all testimony, documentary evidence, and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The Court finds that it has jurisdiction over the subject matter and the parties to this lawsuit under 29 U.S.C. § 1132(e)(1).

2. The Rowley United Pension Fund ("the Plan") is an individual account, defined contribution employee pension benefit plan sponsored by United Artists, a Maryland corporation doing business in the Northern District of Texas. The Plan was established by United Artists' corporate predecessor to provide retirement benefits to participants and beneficiaries of the Plan.

3. Although the Plan is an individual account plan, Plan assets have been pooled for investment purposes.

4. The Plan is administered by a board of trustees whose responsibilities, as set out in the Plan's trust document, include the general supervision and operation of the Plan, the conduct of the Plan's business and the investment, management and disposition of Plan assets.

5. Defendants Chappell, Herrington, Wightman, Wallace, Baxter, Chaffin, and Cernosek have served as trustees of the Plan. These defendants were also employed by United Artists or its corporate predecessor, and were participants in the Plan.

6. Defendant John Rowley was an officer, director, and an employee of United Artists, and was also a participant in the Plan.

7. During the period 1977 through 1986, Defendant trustees caused the Plan to make a series of loans to themselves and other Plan participants. In each case, the loan was secured by the participant/borrower's vested interest in the Plan, and the amount of each loan was limited to one-half the amount of the participant/borrower's vested interest. Defendant trustees did not require Plan participants to submit written applications for the subject loans.

8. The criteria used by the defendant trustees to determine whether to grant a participant a loan were the number of years an individual had participated in the Plan and the amount of the borrower's vested interest. The trustees did not assess the prospective borrower's ability to repay the loan without resort to the security.[1]

9. The Plan's trust document provides that loans made to Plan participants must include a specified period for repayment. Many of the loans made the subject of this lawsuit did not provide for repayment within a specified period of time.[2]

10. In determining the rates of interest to be charged on the loans to participants, the trustees did not base their decision on

---

1. Defendant Dale Chappell testified that the borrower's ability to repay was not really considered; as long as the amount of money in the Plan was sufficient, the loan was considered secure.

2. Plaintiff's Exhibit 1, Rowley United Pension Fund Pension Plan trust document; testimony of Defendant Dale Chappell.

the amount of the loan, the term of the loan, or when the loan was made. Many of the loans in question were made at the singular rate of 7% during the period from 1977 to 1982.[3]

11. The trustees did not call the notes when due and unpaid, nor did they renegotiate the terms of the loans when due.[4]

12. The Plan's investment portfolio included certificates of deposit made contemporaneously with the subject loans. The certificates of deposit earned interest at a higher rate than the loans made to Plan participants.

13. Plaintiff introduced the expert testimony of Dr. Timothy Koch to establish the prevailing standards and practices applied by competent lenders in making, pricing, and managing comparable loans.[5]

14. Competent lenders require evidence of the borrower's ability to repay the loan without resort to the security.[6]

15. Competent and prudent lenders charge fair market rates of interest in accordance with the different amounts, terms and timing of the loans, even if the security for the loans is substantially the same.[7]

16. Competent and prudent lenders enter into written loan agreements setting forth all relevant terms of the loans, and require repayment of the loans when due.[8]

17. The trustees authorized payment of $150.00 per month to Defendant Dale Chappell for his serving as chairman of the Plan's board of trustees from September 1980 through December 1982. For the period from January 1983 through December 1984, the trustees authorized payment to Chappell of $200.00 per month. Chappell

has, at all times relevant to this suit, been employed full time by United Artists.

## CONCLUSIONS OF LAW

 The Plan is an employee pension benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(1). As trustees of the Plan, Defendants Chappell, Herrington, Wightman, Wallace, Baxter, Chaffin, and Cernosek are fiduciaries under ERISA, 29 U.S.C. § 1002(21). These defendants are also parties in interest under ERISA, 29 U.S.C. § 1002(14)(A). Defendant Rowley, by virtue of being an officer, director and employee of United Artists, whose employees are covered by the Plan, is a party in interest with respect to the Plan under ERISA, 29 U.S.C. § 1002(14)(H).

### Loans to Plan Participants

ERISA requires an administrator or trustee of a pension benefit plan to administer the plan as a fiduciary. 29 U.S.C. § 1104(a)(1)(B) requires a fiduciary to discharge his duties with respect to the plan with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." A fiduciary's conduct in discharging his plan duties is examined in light of the standards of trustee conduct derived from the common law of trusts.[9]

 The Court finds that the obligation to act prudently requires plan fiduciaries to act as a prudent man participating in a similar transaction, such as by obtaining a fair return commensurate with prevailing

---

3. Testimony of Dale Chappell.

4. Defendant Dale Chappell testified that the Plan trustees never demanded a note from any borrower because if the borrowers could pay the note, they paid it, and if they could not pay they did not. Chappell testified further that the Plan never demanded a note because the borrower had his or her money in the Plan, and that would cover the note.

5. Dr. Koch testified that the loans in this case are comparable to loans made under compen-

sating balance arrangements, where a lender makes a loan secured by a sum of money deposited by the borrower with the lender.

6. Testimony of Dr. Koch.

7. Testimony of Dr. Koch.

8. Testimony of Dr. Koch.

9. *Central States v. Central Transport, Inc.,* 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985).

or market rates on plan investments.[10]

■ The Court finds that the trustees failed to act prudently, as required by 29 U.S.C. § 1104(a)(1)(B) by (1) failing to require evidence of the borrower's ability to repay the loans without resort to the security; (2) failing to charge fair market rates of interest; (3) failing to enter into written loan agreements setting forth all relevant terms of the loans; and (4) failing to require the repayment of the loans when due, or to appropriately renegotiate the terms of the loans when due.

### The Exclusive Purpose Rule

■ The Court further finds that the "exclusive purpose" rule of ERISA, 29 U.S.C. § 1104(a)(1)(A) requires that plan assets be used "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." The Court is of the opinion that a pension plan such as the Rowley Plan has as its overriding purpose to provide retirement income for its participants and beneficiaries, not to provide or extend credit at discount interest rates.[11]

■ The Court finds that the low rates of interest charged on the loans to the 39 participants who received them resulted in correspondingly low rates of return on the investment of Plan assets for all Plan participants. By extending credit to a limited number of Plan participants at unreasonably low rates, the defendant trustees failed to administer the Plan for the exclusive purpose of providing retirement income benefits to all Plan participants and beneficiaries, as required by ERISA, 29 U.S.C. § 1104(a)(1)(A).

### The Plan Document Rule

■ Under ERISA, 29 U.S.C. § 1104(a)(1)(D), plan fiduciaries are to administer a plan "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter." The Court finds that the defendant trustees violated this rule by failing to provide for repayment of many of the loans within a specified period of time, even though section 9.4(g) of the governing plan document expressly required them to do so.[12]

### Loans to Parties in Interest

29 U.S.C. § 1106(a)(1)(B) prohibits a fiduciary from causing a plan to engage in a transaction that constitutes a "lending of money or other extension of credit between the plan and a party in interest."[13] The Court finds that some of the loans made by the Plan were made to employees of contributing employers, and were therefore made to parties in interest, which is prohibited by 29 U.S.C. § 1106(a)(1)(B).

29 U.S.C. § 1108(b)(1) provides certain exemptions to violations under section 1106(a)(1)(B). The exemption at issue in this case provides:

The prohibitions provided in section 1106 shall not apply to any of the following transactions:

(1) Any loans made by the plan to parties in interest who are participants or beneficiaries of the plan if such loans (A) are available to all such participants and beneficiaries on a reasonably equivalent basis, (B) are not made available to highly compensated employees, officers, or shareholders in an amount greater than the amount made available to other employees, (C) are made in accordance with

---

**10.** *Donovan v. Mazzola,* 716 F.2d 1226 (9th Cir. 1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *Katsaros v. Cody,* 744 F.2d 270 (2d Cir.1984), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir. 1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

**11.** *NLRB v. Amax Coal Co.,* 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981).

**12.** Plaintiffs' Exhibit 1.

**13.** The term "party in interest" is defined in 29 U.S.C. § 1002(14) to include, among others, any fiduciary, a person providing services to the plan, an employer whose employees are covered by the plan, an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors).

specific provisions regarding such loans set forth in the plan, (D) bear a reasonable rate of interest, and (E) are adequately secured.

Loans by a plan to its participants and beneficiaries must meet each of the five requirements of this section in order to be exempt from the provisions of section 1106(a)(1)(B) regarding the prohibited loans to parties in interest.

■ The principal issues presented are whether the interest rates charged by the trustees were "reasonable" within the meaning of subsection (D) of the exemption, and whether the trustees made the loans in accordance with the specific provisions of the governing Plan documents, as required by subsection (C). By failing to provide for repayment of many of the loans within a specified period of time, the trustees failed to make the loans in accordance with the specific provisions of the governing Plan document. As to those loans, the trustees did not meet the requirement of subsection (C) of section 1108(b)(1).

■ With respect to the reasonable rate of interest requirement of subsection (D), the Court finds that the trustees were under an obligation to charge a reasonable rate of interest in light of the prevailing or market rates then existing.[14] The trustees contend that they were merely lending Plan participants "their own money," and therefore it made no difference how much interest was charged on the loans. The Court is of the opinion that this reasoning is at odds with the plain reading of section 1108(b)(1), which requires fiduciaries to charge a reasonable rate of interest. If Plan fiduciaries were allowed to charge any interest rate they chose on such loans, section 1108(b)(1) would be rendered meaningless.

### The Texas Usury Statute

■ Defendants contend that even if the rates of interest they charged on the loans were less than appropriate, they were prevented from charging interest rates of more than 10% by the Texas usury statute, Tex.Rev.Civ.Stat.Ann. Art. 5069–1.04, until the statute was amended in May 1981. The statute provided as follows:

> The parties to any written contract may agree to and stipulate for any rate of interest not exceeding ten percent per annum on the amount of the contract; and all other written contracts whatsoever, except those otherwise authorized by law, which may in any way, directly or indirectly, provide for a greater rate of interest shall be subject to the appropriate penalties prescribed in this Subtitle.

The trustees contend that this statute prevented them from charging rates of interest of more than 10%. The Court finds that this contention is without merit. The Court is of the opinion that the usury statute upon which the trustees rely was preempted by the requirements of ERISA in section 1108(b)(1), which require plan fiduciaries to obtain market rates on plan investments.[15]

■ The Court finds that the trustees were not under any obligations to make these loans. In fact, the trustees had other investment opportunities available to them, with comparable risk, that would have yielded greater rates of return to the Plan than the low interest rates at which the loans were made.

---

**14.** *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).

**15.** See also ERISA, 29 U.S.C. § 1144(a), which provides in part:
> Except as provided in subsection (b) of this section, the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a). . . .

This preemption provision applies to any state law that would interfere with the requirements of ERISA, and not only to laws that specifically address themselves to ERISA-covered employee benefit plans. *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Therefore, to the extent that the statute could have interfered with the trustees' obligation imposed by ERISA to obtain fair market interest rates on the loans, it was preempted.

### Payments to Defendant Chappell

■ 29 U.S.C. § 1106(a)(1)(D) generally prohibits plan fiduciaries from transferring plan assets to parties in interest. The term "party in interest" is defined to include any plan fiduciary, including a trustee. Defendant trustees caused to be paid to Defendant Chappell, a monthly stipend for his serving as chairman of the board of trustees. The Court is of the opinion that these payments were made in violation of section 1106(a)(1)(D).[16] ERISA does provide for an exemption to this prohibition. 29 U.S.C. § 1108(b)(2) provides that the prohibitions of section 1106(a) shall not apply to contracting or making reasonable arrangements with a party in interest for services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid. Section 1108(c)(2) defines reasonable compensation. The regulations and the caselaw under this section make clear that compensation to a fiduciary is prohibited if, among other things, the fiduciary is already receiving "full time pay" from an employer supporting the plan. *Donovan v. Daugherty*, 550 F.Supp. 390 (S.D.Ala.1982); *Gilliam v. Edwards*, 492 F.Supp. 1255 (D.N.J.1980).

The Court finds that the exemption does not apply to the facts of this case. Defendants have admitted that Defendant Chappell was both a full time employee of United Artists and that he received full time pay from United Artists during the period in which he received compensation from the Plan for serving as the chairman of the board of trustees. Under these circumstances, the Court finds that the payments made to Chappell were prohibited.

### Determination of Damages on the Loans

■ The Court relies on the testimony of Dr. Timothy Koch, a professor of banking, economics, and finance, who was qualified as an expert at the time of trial to testify as to prudent lending practices and accompanying interest rates for such practices. Dr. Koch testified and the Court finds that the loans at issue in this case are comparable to loans made under compensating balance arrangements. Compensating balance loans are commonly thought of as loans made by a lender, where the loan is secured by a sum of money deposited by the borrower with that lender. The testimony of Defendant Dale Chappell indicates that the trustees of the Plan believed that the loans made were in effect loans made to borrowers of their own money, and that the vested interests the borrowers had in the Plan would secure the loan.

■ Dr. Koch testified that in his expert opinion the Defendant trustees failed to act as competent and prudent lenders in the following ways:

1. Competent lenders would have required evidence of the borrower's ability to repay the loan without resort to the security, which Defendant trustees failed to do;

2. Prudent lenders would have charged fair market rates of interest in accordance with the different amounts, terms and timing of the various loans, even though the security for the loans was substantially the same, which Defendant trustees failed to do;

3. Under comparable compensating balance arrangements, a competent lender would have established a rate of interest at 1 or 2 points above the rate paid on the borrower's deposit, depending on the size of the loan. Defendant trustees failed to do this as well.

Dr. Koch further testified and the Court finds that in determining a fair market rate of interest for the loans at issue, the trustees had an obligation to consider the rate paid on the borrower's money in the Plan. Using the compensating balance loan analysis, the rate of interest paid on the borrower's money would depend on the size of the deposit, the term of the deposit, and the time at which the funds were deposited. The fair market rate of interest charged on the loan would therefore vary based on the differences in the sizes of the deposits and

---

16. *Donovan v. Daugherty*, 550 F.Supp. 390 (S.D. Ala.1982).

loans.[17]

Dr. Koch calculated a range of fair market rates for each individual loan, which he termed the lower bound and upper bound rates of interest which competent lenders would have charged on the loans in the marketplace. The principal loss to the Plan based on this comparison amounts to $382,683. This amount was calculated using the lower bound rate for each loan and comparing it to the rates of interest actually charged by the Plan on each loan.[18]

Defendant trustees were inconsistent in the manner in which they priced and managed the loans to Plan participants. A prudent lender would have entered into written loan agreements setting forth all relevant terms of the loans, and would have required the repayment of the loans when due. The Plan's records and the testimony of Dr. Koch and Defendant Dale Chappell indicate that the Defendant trustees did not, with any consistency, call the loans when in default and due. Furthermore, the Court finds that Defendant trustees inconsistently renegotiated the terms of the loans when due as well. These practices are in violation of Defendant trustees' fiduciary duty to the Plan and its participants.

The testimony offered in this case from both sides indicates that Defendant trustees believed that they were simply lending the Plan participants their own money, not investing Plan assets. Plan assets, according to the governing Plan documents, were pooled for investment purposes. The Court therefore finds that a low rate of return to the Plan on any loan was in effect a low rate of return on all of the Plan participants' funds.

Dr. Koch testified that the less than prudent rates of interest charged on the loans resulted in what is known as a reinvestment loss to the Plan.[19] Using Plaintiff's Exhibits 143–153, 155–197, and 204 the Court finds that the reinvestment loss to the Plan totals $252,906. The Court therefore finds that the total loss to the Plan is found by adding the loss calculated from comparing what the lower bound fair market rates on each loan would generate with the amounts actually charged by the Plan ($382,683) to the amount calculated as the reinvestment loss ($252,906) for a total of $635,588.

The Court finds that Defendant trustees shall be liable to make the Plan whole in accordance with these findings in the amount of $635,588. The Court further finds that the individual account balances of the Plan's participants should be credited so as to properly reflect the allocations of the restored income as of the date it would have been received absent Defendants' breaches of their fiduciary duties.

*Determination of Damages—Payments to Dale Chappell*

Based on the conclusions made earlier in this Order, the Court finds that Defendant Dale Chappell was paid as Chairman of the Plan's board of trustees $150 per month from September 1980 through December 1982 (28 months at $150 equals $4,200), and $200 per month from January 1983 through December 1984 (24 months at $200 equals $4,800), and that these payments are pro-

---

17. Testimony of Dr. Timothy Koch, October 20, 1987.

18. Plaintiff's Exhibits 143–153; 155–197; 204.

19. Dr. Koch testified on October 20, 1987:
 Well, a reinvestment loss can best be associated with the concept of an opportunity cost. In this particular case the lender has lost the investment income that could have been earned had he—had the borrower paid the timely interest and lien payments on the loan. He lost the value of the time value of those funds for the interval over which he hadn't had the funds to invest.

 [responding to a question regarding how reinvestment loss is calculated] Well, again I wanted to be extremely conservative, so what I wanted to do was use the lowest market rate, money market rate, available at the time each of these losses would originate. So what I did is I accumulated the loss. You really couldn't get a money market rate until you had at least $10,000 in losses. So until the losses totaled $10,000, I assumed they reinvest those at the simple passbook savings rate which would have been, the earlier part of 1970, just five percent.
 The primary loss to the Plan first exceeded $10,000 in November 1978.

**1342**

hibited by ERISA. The Court finds that Defendant trustees erroneously paid Defendant Dale Chappell a total of $9,000.

### Injunctive Relief

 Finding that Defendant Trustees violated their fiduciary duties in conducting the business of lending Plan assets to Plan participants, the Court finds that under ERISA it is appropriate to require Defendants to resign their positions as trustees of the Plan, and to enjoin all Defendants from serving as fiduciaries to any other ERISA-covered plan for a period of five years.[20]

---

**20.** *Donovan v. Mazzola,* 716 F.2d 1226 (9th Cir. 1983).