BOARD OF TRUSTEES OF THE VILLAGE OF BARRINGTON POLICE PENSION FUND, Plaintiff-Appellant, v. THE DEPARTMENT OF INSURANCE *et al.*, Defendants-Appellees.

First District (6th Division) No. 1—89—2528

Opinion filed March 22, 1991.

Doss, Puchalski & Keenan, Ltd., of Chicago (Richard J. Puchalski, of counsel), for appellant.

Neil F. Hartigan, Attorney General, and Pfeifer & Kelty, both of Springfield, and Arnstein & Lehr, of Chicago (Robert J. Ruiz, Solicitor General, and Daniel N. Malato, Assistant Attorney General, of Chicago, and Thomas W. Kelty, J. William Braithwaite, Eugene J. Kelley, Jr., Arthur L. Klein, and Leslie W. Loftus, of counsel), for appellees.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Plaintiff Board of Trustees of the Village of Barrington Police Pension Fund (Pension Board) filed a declaratory action against the Illinois Department of Insurance and its Director, John R. Washburn (collectively, the Department). The complaint questioned the propriety of the Department's finding that the Pension Board had violated the Illinois Pension Code (Ill. Rev. Stat. 1987, ch. 108½, par. 1—101 *et seq.*) by investing pension funds in a below market rate home mortgage loan program (program) available to its participants and beneficiaries (members). The trial court granted defendant Village of Barrington's (Village's) petition for leave to intervene.

On August 23, 1989, the trial judge ruled on the parties' cross-motions for summary judgment, presented by way of stipulated facts. The trial judge held that the Pension Board's program was violative of the Pension Code and common law trust principles, and that the program amounted to "compensation" to its members. The Pension Board appeals, requesting that this court reverse the trial court's finding and declare the validity of the program. We reverse and remand.

The Pension Board has the sole authority to invest pension fund assets provided such investments comport with the provisions of the Illinois Pension Code. The Department is the State agency which regulates the pension fund at issue in this case, and the Department is empowered to take legal action against pension funds or their trustees. In July of 1984, the Pension Board investigated the possibility of establishing a residential mortgage investment program wherein the members of the Barrington Police Pension Fund (the Fund) could receive mortgages at lower than market interest rates.

The Pension Board consulted actuaries, pension and labor lawyers and bankers in developing the program. The Pension Board hired the actuarial and consulting firm of Hewitt Associates to do a study of the implementation of the program. Hewitt Associates issued a report and concluded that the implementation of such a program would have no adverse impact upon the benefit security of the Fund. The Pension Board filed an action for declaratory judgment in 1985, seeking to have the validity of the proposed program affirmed. The court, however, declined to rule as to the validity of the program due to the fact that the program had not yet been implemented.

On June 30, 1986, the Pension Board entered into a written agreement with AmeriFed Federal Savings Bank (AmeriFed). This agreement, which made the program available only to the Fund's participants and beneficiaries, worked as follows: Pension funds were not loaned directly to the individuals receiving loans. Two accounts were established at AmeriFed. One account was a market rate account which bore interest at the standard rate paid to all AmeriFed money management account holders. The other account was a matching fund account. As loans were made by AmeriFed to qualified persons, an amount equal to the loan was transferred from the market rate account to the matching account. Earnings and repayments were transferred from the latter account to the former account on a quarterly basis. The purpose of these two accounts is to ensure that the Fund would return the greatest return on its investment under the program.

Under the agreement, AmeriFed would make residential loans to persons who qualified under the program at a rate of 2½% below AmeriFed's current "note rate." Funds which were deposited in the matching account earned interest at a rate of 2¼% below AmeriFed's current note rate. In 1988, the difference between the interest earned in the market rate account and the interest earned in the matching account was .25%. The agreement provided that AmeriFed would not loan money if the interest paid to the Pension Board's matching account would be less than the annual interest rate assumption issued to the Village by the Department in order to determine tax levy requirements for the Fund.

AmeriFed charged no fees to the Fund under the agreement. The individuals qualifying for a loan were charged certain customary fees, and the applicant's financial qualification was determined by AmeriFed, which applied its standard underwriting criteria in determining the prospective mortgagor's financial qualification. Under the agreement, AmeriFed warrants that all funds held will be fully insured in the aggregate of up to $100,000 for each participant and beneficiary, provided that the accrued value of any member does not exceed $100,000. Mortgages of up to $125,000 are authorized. The Pension Board agreed to limit its total investment under the program to $1 million.

The Pension Board posted an agreement it made with its members which detailed the rights of the current and retired police officers who were members of the Fund. This document established a selection system among pension fund members as to participation in the program. Eligibility to participate included such criteria as police service for three years, a declaration of intention to participate, and that the officer not be on a leave of absence or suspended from the force. No participants or beneficiaries objected to the program, and all members who chose to participate in the program, nine to date, have been allowed to do so.

If an officer left the department or withdrew from the Fund, he was no longer able to participate in the program, and the mortgage rate would increase to the current mortgage rate. If there was a default, the Fund accrues no liability.

At the time that the program was implemented, three of the trustees were eligible to participate in the program, though none have elected to do so. From 1986, when the program was implemented, to 1988, the Fund's monetary assets have increased. The rate of return on the Fund's assets, however, has declined from 9.975% in 1986 to 8.902% in 1988. The Fund was fully funded in 1988. At the end of

1988, some 18% of the Fund's total assets were invested in the program. An additional 12% of the Fund's assets were committed to the matching account. The rates the Fund received on other accounts than those involved in the program varied from 7.25% to 12%.

The Village objected to the implementation of the program. The Village also commissioned an actuarial firm Towers, Perrin, which studied the program. Towers, Perrin issued a report which concluded that while the program may not threaten benefit security, the program could force the Village to levy over $1 million in additional taxes on real property over the 30-year period the program is to extend. The study also concluded that the Fund will have $2.4 million less at the end of the 30-year period.

In 1987, the Department conducted an examination of the Fund for the five-year period ending April 30, 1986. In July of 1987, the Department issued a report contending that the program violated provisions of the Illinois Pension Code, and the Department ordered the Pension Board to terminate the program. The Pension Board filed suit for declaratory judgment.

The Pension Board, the Department and the Village all presented motions for summary judgment. In granting defendants' motions for summary judgment, the trial court held that the program amounted to compensation in violation of Illinois law. Additionally, the trial court held that the program was violative of both the "exclusive purpose" rule in the Pension Code and the common law of trusts. The trial court did not rule on whether the program was an imprudent investment or whether the program constituted a prohibited transaction under the Pension Code.

The first issue we shall address is whether the program impermissibly provides compensation to employees of the Village. The Village contends that the providing of discount mortgages to the members constitutes an attempt by the Pension Board to usurp the Village's sole authority to compensate its employees. As authority for this argument, the Village cites section 3—13—2 of the Illinois Municipal Code (Ill. Rev. Stat. 1987, ch. 24, par. 3—13—2), which provides in pertinent part: "No compensation shall be paid to any city officer or employee in addition to that provided in the ordinance fixing his salary."

■■ The Village has not cited any case law construing this statutory provision. A review of the case law involving issues of additional compensation under this statute, however, reveals that the issues center around whether an employee has been entitled to additional compensation (for services rendered) *from the city*. At issue in these cases

is the city's liability for such service as overtime work (see *Gathemann v. City of Chicago* (1914), 263 Ill. 292, 104 N.E. 1085), and whether the work an employee performed was contemplated within his occupational duties with the city and whether his compensation thus was limited to that fixed by ordinance (see *Osborne v. City of Alton* (1954), 4 Ill. 2d 605, 123 N.E.2d 847). The Village does cite case law containing principles of statutory construction in arguing that we should not construe the Pension Code to allow the Pension Board investment authority to additionally compensate village employees. This argument, however, assumes that the program amounts to current compensation. Here, there is simply no issue as to the Village's liability; it is the fund that has implemented the program. Moreover, participants and beneficiaries are eligible for the program only by virtue of membership in the Fund, not as remuneration for services rendered. We hold that the program does not constitute current compensation in violation of Illinois law.

We next address the other grounds upon which the trial court based the granting of defendants' motions for summary judgment. The trial court held that the program was violative of both the Pension Code's exclusive purpose rule and the common law of trusts. In arriving at the conclusion that it was error for the trial court to do so, we focus on an area the trial court did not: that of prudence.

■ Initially, we note that given the lack of Illinois case law construing the relevant portions of the Pension Code, we look for guidance to analogous provisions of the Employee Retirement Income Security Act of 1974 (29 U.S.C. §1001 *et seq.* (1988)) (ERISA) and the Federal case law construing ERISA.

■ The trustees of the Pension Board are fiduciaries under the Pension Code. (Ill. Rev. Stat. 1987, ch. 108½, par. 1—101.1.) Trustees of a pension fund are likewise fiduciaries under ERISA. (29 U.S.C. §1002(21)(A) (1988).) Both the Department and the Village argue, as they did below, that the program was an imprudent investment. Section 1—109(b) of the Pension Code provides that the Pension Board should discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." (Ill. Rev. Stat. 1987, ch. 108½, par. 1—109(b).) Essentially the same language requiring prudence is found in ERISA. See 29 U.S.C. §1104(a)(1)(B) (1988).

■ Prudence under ERISA is measured according to the objective prudent person standard which has been developed in the com-

mon law of trusts. (*Fink v. National Savings & Trust Co.* (D.C. Cir. 1985), 772 F.2d 951, 955.) A court's task in evaluating fiduciary compliance under ERISA is to inquire "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." (*Donovan v. Mazzola* (9th Cir. 1983), 716 F.2d 1226, 1232.) A fiduciary's independent investigation of the merits of a particular investment is "at the heart of the prudent person standard." *Fink*, 772 F.2d at 957.

█ In arguing that the Pension Board failed to exercise reasonable prudence when investing in the program, the Department emphasizes that the program's matching account received .25% lower interest than the market account, which received an interest rate identical to AmeriFed's other management accounts. The Department contends that the Pension Board acted imprudently by putting any funds in the lower interest matching account, and also that the Pension Board acted imprudently in implementing the program at all, as the Fund will lose some $2.4 million in assets over the next 30 years as a result of the lower rate the Fund receives through the program, as opposed to other Fund investments. The Department has not provided any evidence, however, nor has the Department raised the argument that the Pension Board could have procured a better deal from an institution other than AmeriFed. Nor has the Department provided any evidence that the Pension Board could have procured any better deal from AmeriFed itself.

The Village cites *McLaughlin v. Rowley* (N.D. Tex. 1988), 698 F. Supp. 1333, for the proposition that it was imprudent for the Pension Board to invest and receive a lower than prevailing rate of interest. In *McLaughlin*, the trustees of a pension fund made loans to participants and charged lower interest than the market rate. While the court held that the trustees acted imprudently in administering the program, it is important to note that the court based this conclusion on several factors in addition to the lower interest rate, including failure to require evidence of borrowers' ability to repay the loan without resort to the security (the security being the participant's vested interest in the plan), failure to enter written agreements setting forth all relevant terms of the loans, and failing to require repayment of the loans when due or to properly renegotiate the loans. (*McLaughlin*, 698 F. Supp. at 1338.) Thus, *McLaughlin* is distinguishable from the instant case. Moreover, in *Brock v. Walton* (11th Cir. 1986), 794 F.2d 586, where the fund itself issued mortgage loans to its participants at more than two percentage points less interest than the market rate,

the court clearly held that the evidence of a lower than market interest rate, alone, was insufficient to create a question as to whether the trustees failed to charge a reasonable rate of interest or violated the rule of prudence. We thus conclude that the fact that the program earned a less than market rate of interest, alone, is insufficient reason to hold as a matter of law that the program was an imprudent investment in violation of the Pension Board's fiduciary duty.

The Pension Board emphasizes that it consulted actuaries and attorneys in implementing the program. We are not convinced, however, that these facts, alone, entitle the Pension Board to judgment on the issue as a matter of law, either. This is because "[a]lthough due care will often demand the taking of advice from attorneys, appraisers, investment bankers, and from others, the fact that such advice was obtained does not of itself show that the trustee has used the requisite caution. He may have been guilty of a lack of ordinary judgment in weighing all the evidence he obtained about the projected investment." (G. Bogert, *Trusts and Trustees* §612, at 28-29 (2d ed. 1980).) Because of our inability to determine as a matter of law the prudence of the investment at issue, we remand this case to the trial court for a determination of the issue.

Being unable to assess the prudence of the investment, and for other reasons which we shall discuss, we are unable as well to determine that the program is violative of the other provisions of the Pension Code defendants cite or violative of the common law of trusts.

While there is no Illinois case law construing the exclusive purpose rule in the Pension Code, it is apparent, both from the language of the statute and the parties' analysis of the statute, that the provision is essentially a codification of common law trust principles. Under section 1—109 of the Pension Code (Ill. Rev. Stat. 1987, ch. 108½, par. 1—109), a pension board must discharge all its duties "solely in the interest of the participants and beneficiaries *** [f]or the exclusive purpose of: (1) Providing benefits to participants and their beneficiaries; and (2) Defraying reasonable expenses of administering the retirement system or pension fund." Under established principles of the law of trusts, "[a] trustee must act honestly and with undivided loyalty to his trust." (*Rennacker v. Rennacker* (1987), 156 Ill. App. 3d 712, 715, 509 N.E.2d 798.) A trustee under Illinois law is a fiduciary and must serve the interest of his beneficiary excluding self-interest. (*Home Federal Savings & Loan Association v. Zarkin* (1982), 89 Ill. 2d 232, 239, 432 N.E.2d 841.) This exclusive purpose rule prohibits a trustee from dealing with the trust property for his

individual benefit. See *Central Standard Life Insurance Co. v. Gardner* (1959), 17 Ill. 2d 220, 161 N.E.2d 278.

In this case, as there has been no determination of the prudence of the transaction, we are left with the possibility that the program may well be a prudent investment. Assuming this to be the case, we are hesitant to conclude that the program violates the exclusive purpose rule or the common law rule of trusts for a number of reasons. First, if the investment in question is deemed a prudent one, we are not troubled by the possibility that some members of the fund will receive the benefit of discounted mortgage loans. If the investment is a prudent one from an objective standard, we would not discourage the Pension Board from also procuring an incidental benefit of the type at issue. The exclusive purpose rule under ERISA, which is identical to the rule found in our Pension Code, "does not prohibit a party other than a plan's participants and beneficiaries from benefitting in some measure from a prudent transaction with the plan." (*Donovan v. Walton* (S.D. Fla. 1985), 609 F. Supp. 1221, 1245.) Surely, then, there is no conflict where members of the fund may additionally benefit from a prudent transaction. Moreover, ERISA itself specifically allows a fund to make loans to its members, providing, *inter alia*, that such loans are available to members on a reasonably equivalent basis and bear a reasonable rate of interest. Here, the program did make participation available on a reasonably equivalent basis and, as we will discuss, we are unable to say that the loans did not bear a reasonable rate of interest.

A review of Federal decisions which have found violations of the exclusive purpose rule under ERISA reveals situations where there is an imprudent transaction in which the trustee has a personal stake. (See, *e.g.*, *Leigh v. Engle* (7th Cir. 1984), 727 F.2d 113; *Donovan v. Bierwirth* (2d Cir. 1982), 680 F.2d 263.) No such circumstance is presented in this case. Moreover, the conduct of the Pension Board was "above board" throughout the implementation of the program, as the trial judge observed. The members, fully informed of its implementation, voiced no objections to the program. To date, there have been no members turned away from participation in the program. Moreover, there is no indication why in the future, should more members choose to participate in the program than the program currently accommodates, the Pension Board could not invest greater amounts of money as the Fund's assets continue to increase to accommodate extra members. In sum, absent a finding regarding prudence, we are not convinced that the Pension Board's investment, as a matter of law, is vi-

olative of either the exclusive purpose rule or the common law of trusts.

Both the Department and Village argue that the program was a prohibited transaction under the Pension Code. The Pension Code provides that fiduciaries, such as the Pension Board, may not engage "direct[ly] or indirect[ly]" in certain transactions, including:

> "Lending of money or other extension of credit from the retirement system or pension fund to a party in interest without the receipt of adequate security and a reasonable rate of interest, or from a party in interest to a retirement system or pension fund with the provision of excessive security or an unreasonably high rate of interest." Ill. Rev. Stat. 1987, ch. 108½, par. 1—110(a)(2).

The Department argues that the program is violative of the above provision because the Pension Board received inadequate consideration for the program, while the Village argues that the program violates the above provision because it receives an unreasonable rate of interest. Both prohibitions defendants rely on, however, refer to the loaning or transferring of funds to parties in interest. Here, the Pension Board has not loaned or transferred funds to the members. Rather, the Pension Board has invested in a program whereby AmeriFed makes the loans to the participants. Moreover, as is the case with regard to the argument defendants make concerning prudence, defendants have not argued any facts of record which indicate that the Pension Board could have procured any better deal than it did. In *Brock*, the court refused to hold that the mere showing of a below market interest rate was enough to present a factual question concerning whether the trustees failed to charge a reasonable rate of interest. (*Brock*, 794 F.2d at 587.) Similarly, we cannot say, as a matter of law, that merely because the investment here obtained an interest rate at below the market rate the investment fails for lack of consideration or because of an unreasonably low interest rate.

The Department also argues that the program constitutes a prohibited transaction because some of the Pension Board trustees who implemented the program could elect to participate in the program (although none have to this date). As the Department acknowledges, however, section 1—110(c)(1) of the Pension Code provides that a trustee is not prohibited from "[r]eceiving any benefit to which he may be entitled as a participant or beneficiary in the retirement system or pension fund." (Ill. Rev. Stat. 1987, ch. 108½, par. 1—110(c)(1).) The Department argues that this provision justifies the trustee's eligibility for the program only if the program does not vio-

late the other provisions of the Pension Code which the parties have discussed. Thus, this issue is only duplicative of the others. As the program is not violative of the exclusive purpose rule or rule of prudence as a matter of law, it follows that the program is not a prohibited transaction under the Pension Code as a matter of law.

 Our holding should in no way indicate that the mere existence of incidental benefits to all or some members of a pension fund justifies any investment by a pension board. We emphasize that the transaction at issue was one enacted by the Pension Board after full disclosure, without objection, by a fund that has become fully funded, and whose portfolio has been successful as evidenced by the fund's continued increase in assets. Further, the only indication is that the program will not threaten benefit security.

Finally, we address the Pension Board's contention that the Village should not have been allowed to intervene as a party to the litigation. The Pension Board contends that the Village did not meet any of the requirements for mandatory intervention as no statute conferred the right to intervene to the Village, the Village cannot show that its interests are not adequately represented by the State, and there has been no showing that the Village will be adversely affected by a distribution or other disposition of property. Moreover, the Pension Board contends, the Village has no standing to challenge the program's validity, the Village's assertion that an increase in tax levies may occur is speculative, and taxpayers, not the Village, would suffer the injury of any tax increase. Thus, according to the Pension Board, permissive intervention is inappropriate as well.

 ██ Intervention in Illinois is governed by section 2—408 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—408), which provides, in pertinent part:

"(a) Upon timely application anyone shall be permitted as of right to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property in the custody or subject to the control or disposition of the court or a court officer.

(b) Upon timely application anyone may in the discretion of the court be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an

applicant's claim or defense and the main action have a question of law or fact in common."

The intervention section of the Code of Civil Procedure is to be liberally construed. (*Bredberg v. City of Wheaton* (1962), 24 Ill. 2d 612, 623, 182 N.E.2d 742.) A trial court's decision to allow leave to intervene will not be disturbed absent an abuse of discretion. (*Ackmann v. Clayton* (1976), 39 Ill. App. 3d 1013, 1014, 350 N.E.2d 824.) The purpose of the intervention is to expedite litigation by disposing of the entire controversy among the persons involved in one action to prevent a multiplicity of lawsuits. (*University Square, Ltd. v. City of Chicago* (1979), 73 Ill. App. 3d 872, 877-78, 392 N.E.2d 136.) The threshold determination a trial court must make is whether the requirements of the intervention statute have been met. *University Square*, 73 Ill. App. 3d at 878.

 To intervene, "[a] party need not have a direct interest in the pending suit but it must have an interest greater than that of the general public [citation], so that the party may stand to gain or lose by the direct legal operation and effect of a judgment in the suit." (*Caterpillar Tractor Co. v. Lenckos* (1981), 84 Ill. 2d 102, 112.) The Pension Board relies on the *University Square* case in arguing that the Village should not have been allowed to intervene. In that case, the intervenor was both the alderman of the ward and a taxpayer who lived over a mile from the site where building permits were issued. He contended that "the escalation of population density and traffic caused by plaintiff's project would adversely affect his use and enjoyment of his property." (*University Square*, 73 Ill. App. 3d at 878.) The trial court acknowledged that the intervenor did not meet the requirements of the intervention statute, but allowed the petition to intervene "as a means of permitting the procedural and substantive matter to be presented to the Appellate Court at one time, thereby avoiding a piecemeal appeal." (*University Square*, 73 Ill. App. 3d at 877.) As indicated above, the appellate court held that the initial determination in an intervention case is whether the requirements of the statute authorizing intervention have been met. The court further held that intervention in that case was not warranted.

 In this case, the Pension Board does not dispute that the Village budgets money for the Pension Fund, nor does it dispute that the program may cause an increase in the tax levies, estimated to be well over $1 million during the life of the program. A basic tenet of the intervention statute is that it is remedial and should be liberally construed. (*People v. Roush* (1982), 111 Ill. App. 3d 618, 444 N.E.2d 625.) The Department and Village have different interests at stake,

and the evidence indicates that the Village can be affected by the resolution of the program's validity. We therefore hold that the trial court did not abuse its discretion in allowing the Village leave to intervene.

Accordingly, the judgment of the circuit court is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

EGAN and LaPORTA, JJ., concur.